UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LANSUPPE FEEDER, LLC,

                Plaintiff,

    vs.

WELLS FARGO BANK, NATIONAL
ASSOCIATION, as Trustee for Soloso CDO
2005-1 Ltd.,

                Defendant,

    and

SOLOSO CDO 2005-1 LTD.,

                Nominal Defendant,

    and

OXFORD UNIVERSITY BANK; CITIZENS
BANK & TRUST COMPANY; COASTAL
COMMERCE BANK; GUARANTY BANK
AND TRUST COMPANY; BANKFIRST
FINANCIAL SERVICES; THE FIRST, A
NATIONAL BANKING ASSOCIATION;
COPIAH BANK, NATIONAL ASSOCIATION;
& PRIORITYONE BANK,

                Intervenors.

Case No. 1:15-cv-07034 (LTS)

---

**MEMORANDUM OF LAW IN OPPOSITION TO INTERVENORS'
CROSS-MOTION FOR SUMMARY JUDGMENT**

---

Jonathan E. Pickhardt
Andrew S. Corkhill
Blair A. Adams
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiff
Lansuppe Feeder, LLC*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................iii

PRELIMINARY STATEMENT ............................................................................................ 1

COUNTERSTATEMENT OF DISPUTED AND UNDISPUTED FACTS ............................... 3

    A.    At The Time Of Investment, The Intervenors Made A Calculated Decision To Accept Greater Risk In Exchange For Higher Yield......................... 3

    B.    The Intervenors Initially Sought To Prevent The Liquidation Of The Trust Estate......................................................................................................... 4

    C.    The Intervenors Subsequently Consented To Liquidation Of The Trust Estate And Sought Pro Rata Distribution Of The Funds ......................... 6

    D.    The Court Directed The Liquidation Of The Trust Estate And Ordered Further Briefing Regarding The Disposition Of The Funds ................... 7

ARGUMENT ..................................................................................................................... 8

I.    THERE IS NO PRIVATE RIGHT OF ACTION UNDER SECTION 47(B) OF THE ICA ...................................................................................................... 8

II.    EVEN IF A PRIVATE RIGHT OF ACTION EXISTED UNDER SECTION 47(B), RESCISSION SHOULD NEVERTHELESS BE DENIED IN THIS CASE ...... 12

    A.    The Intervenors' Claims Are Barred By The Statutes Of Limitations And Repose....................................................................................................... 12

    B.    Any Claim For Rescission Lies Against The Initial Purchaser (Or Another Seller), Not the Issuer ............................................................................. 15

    C.    The Indenture Did Not Violate The ICA, Nor Does Its Performance Require A Violation Of The ICA.............................................................. 16

    D.    Rescission Would Be Inequitable And Inconsistent With The Purposes Of The ICA ................................................................................................... 18

III.    EVEN IF RESCISSION WERE GRANTED, THE PRIORITY OF PAYMENTS WATERFALL WOULD STILL GOVERN DISTRIBUTION OF THE FUNDS .......... 20

    A.    The Priority Of Payments Provisions Are Severable From Any Provision In The Indenture That Violates The ICA .............................................. 20

    B.    As A Bona Fide Purchaser, Lansuppe Is Expressly Permitted To Enforce The Priority of Payments Provisions In The Indenture ....................... 21

IV.    EVEN IF THE FOREGOING LEGAL ISSUES WERE NOT DISPOSITIVE, THE FACTUAL RECORD NEVERTHELESS PRECLUDES SUMMARY JUDGMENT ................................................................................................. 22

CONCLUSION........................................................................................................................24

# TABLE OF AUTHORITIES

**Page**

## Cases

*Alexander v. Sandoval,*
532 U.S. 275 (2001) ...........................................................................9, 10, 11

*Bellikoff v. Eaton Vance Corp.,*
481 F.3d 110 (2d Cir. 2007) .............................................................10 n.7, 11

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) .............................................................................8

*Christian v. Christian,*
42 N.Y.2d 63 (1977) ...........................................................................20

*Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.,*
271 F.3d 374 (2d Cir. 2001) .................................................................8

*Drasner v. Thomson McKinnon Secs., Inc.,*
433 F. Supp. 485 (S.D.N.Y. 1977) .......................................................17 n.14

*Epstein v. Kemper Ins. Cos.,*
210 F. Supp. 2d 308 (S.D.N.Y. 2002) ..................................................22

*Giannullo v. City of N.Y.,*
322 F.3d 139 (2d Cir. 2003) .................................................................8

*In re Global Crossing, Ltd. Sec. Litig.,*
313 F. Supp. 2d 189 (S.D.N.Y. 2003) ..................................................12 n.10

*Hamilton v. Allen,*
396 F. Supp. 2d 545 (E.D. Pa. 2005) ...................................................19

*Kahn v. Kohlberg, Kravis, Roberts & Co.,*
970 F.2d 1030 (2d Cir. 1992) ...............................................12, 13, 14, 15

*Laborers' Local 265 Pension Fund v. iShares Trust,*
2013 WL 4604183 (M.D. Tenn. Aug. 28, 2013) *aff'd*, 769 F.3d 399 (6th Cir. 2014) .............9

*Lanza v. Carbone,*
130 A.D.3d 689 (2d Dep't 2015) ..........................................................20

*Mutchka v. Harris,*
373 F. Supp. 2d 1021 (C.D. Cal. 2005) ................................................10

*In re Mutual Funds Investment Litigation,*
384 F. Supp. 2d 873 (D.Md. 2005) .......................................................10 n.6

*Occidental Life Ins. Co. of N.C. v. Pat Ryan & Assocs., Inc.,*
496 F.2d 1255 (4th Cir. 1974) ..............................................................17 n.14

*Olmsted v. Pruco Life Ins. Co. of N.J.*,
    283 F.3d 429 (2d Cir. 2002) .................................................................. 10 & n.7

*Omega Overseas Partners, Ltd. v. Griffith*,
    2014 WL 3907082 (S.D.N.Y. Aug. 7, 2014) ....................................13, 16, 17, 18 n.15

*P. Stolz Family P'ship L.P. v. Daum*,
    355 F.3d 92 (2d Cir. 2004) .................................................................14

*Phx. Four, Inc. v. Strategic Res. Corp.*,
    2006 WL 399396 (S.D.N.Y. Feb. 21, 2006) ..................................................13

*In re Regions Morgan Keegan Securities*,
    743 F. Supp. 2d 744 (W.D.Tenn.2010) ..................................................10 n.6, 15

*SEC v. Capital Gains Research Bureau, Inc.*,
    375 U.S. 180 (1963) .................................................................13, 19

*Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co. (U.S.A.)*,
    677 F.3d 178 (3d Cir. 2012), *cert. denied* 133 S. Ct. 529 (2012) .................................9, 11 n.8

*Smith v. Franklin/Templeton Distribs., Inc.*,
    2010 WL 2348644 (N.D. Cal. Jun. 8, 2010) .................................................9

*Smith v. Oppenheimer Funds Distrib., Inc.*,
    824 F. Supp. 2d 511 (S.D.N.Y. 2011) ..................................................9, 10, 11

*Stegall v. Ladner*,
    394 F. Supp. 2d 358 (D. Mass. 2005) .................................................10

*Steinberg v. Janus Capital Mgmt., LLC*,
    457 F. App'x 261 (4th Cir. 2011) .................................................9

*Steinberg v. Sherman*,
    2008 WL 2156726 (S.D.N.Y. May 8, 2008) .................................................16

*Transamerica Mortgage Advisors, Inc. v . Lewis*,
    444 U.S. 11 (1979) .................................................................11 n.8

*Wiener v. Eaton Vance Distributors Inc.*,
    2011 WL 1233131 (D. Mass. Mar. 30, 2011) .................................................10 n.6

**Statutes**

15 U.S.C. 80a-2(a)(51)(a) .................................................................23

15 U.S.C. 80a-3(c)(7) .................................................................23

15 U.S.C. § 80a-35(b) .................................................................11

15 U.S.C. § 80a-41 .................................................................11

15 U.S.C. § 80a-46(b) .................................................................9, 15, 18, 20, 21

iv

28 U.S.C. § 1658(b) .............................................................................................12 n.10

## Regulations

17 C.F.R. § 270.2a51-1(h) ................................................................................................24

## Rules

FED. R. CIV. P. 56(a) ........................................................................................................8

FED. R. CIV. P. 56(d) ........................................................................................................8

## Legislative Documents

H.R. REP. 96-1341, at 37 (1980) ...............................................................................17 n.14

S. REP. NO. 76-1775, at 20, 23 (1940) ............................................................................13

## Secondary Sources

Andrew R. Johnson, *Zions Not Only Bank to Be Hit by Volcker CDO Impact*,
      WALL ST. J. (Dec. 17, 2013 4:31 PM),
      http://blogs.wsj.com/moneybeat/2013/12/17/
      zions-not-only-bank-to-be-hit-by-volcker-cdo-impact/ ..................................................23 n.17

Plaintiff Lansuppe Feeder, LLC ("Lansuppe") respectfully submits this memorandum of law in opposition to Intervenors' Cross-Motion for Summary Judgment, dated October 5, 2015, in the above-captioned action against Nominal Defendant Soloso CDO 2005-1 Ltd. ("Soloso," the "Soloso CDO" or the "Issuer") and Defendant Wells Fargo Bank, National Association ("Wells Fargo" or the "Trustee").

## PRELIMINARY STATEMENT

Between 2005 and 2007, each of the Intervenors—13 Mississippi and Louisiana banks—made a calculated decision to invest in heavily subordinated Notes issued by the Soloso CDO, thereby accepting greater risk in exchange for a higher yield on their investment.[1]  Having gladly accepted the higher yields on those Notes for a period of years, the Intervenors are now desperately attempting to avoid the losses they agreed to bear in the event the CDO's collateral performed poorly, because the risks they accepted have finally materialized.  To this end, the Intervenors initially argued that the Indenture prevented the Trustee from liquidating the collateral without the approval of 100% of the Noteholders.  After conceding that this argument was meritless, the Intervenors next claimed that liquidation was precluded by the Investment Company Act of 1940 (the "ICA"), before similarly abandoning that argument when pressed by the Court.

Having finally conceded that the CDO collateral could and should be liquidated, the Intervenors now contend that the liquidation proceeds should be distributed amongst Noteholders pro rata, rather than pursuant to the priority of payments waterfall in the Indenture, which requires senior Noteholders such as Lansuppe to be paid ahead of junior Noteholders such as the Intervenors.  According to the Intervenors, pro rata distributions are appropriate because six of

---

[1]  Capitalized terms used but not defined herein shall have the meaning set forth in the Indenture.

the Intervenors now claim to be "non-qualified purchasers" ("NQPs")—notwithstanding representations to the contrary at the time of purchase—and consequently every Noteholder is entitled to rescission under Section 47(b) of the ICA.  This third and final argument is every bit as meritless as the first two arguments advanced and subsequently abandoned by the Intervenors, and should be rejected for a multitude of reasons.

As a threshold matter, the Intervenors have no claim for the simple reason that—according to well-settled authority—there is no private right of action under Section 47(b) of the ICA.  Moreover, even if the Intervenors did have a private right of action—which they do not—their claims would nevertheless fail.  *First*, they are time-barred by the applicable statutes of limitations and repose.  *Second*, any claim for rescission lies against the Initial Purchaser (or a subsequent seller in the secondary market), not the Issuer or the Trust Estate.  *Third*, the Indenture cannot be rescinded, because its performance did not require a violation of the ICA.  On the contrary, the conduct that allegedly violated the ICA—selling Notes to NQPs—is expressly prohibited by the Indenture.  *Finally*, the relief that the Intervenors seek would be patently inequitable to senior Noteholders and is therefore expressly prohibited under the plain terms of Section 47(b) of the ICA.

Even assuming the Intervenors were entitled to rescission—which they clearly are not—Section 47(b) nevertheless mandates that the liquidation proceeds be distributed pursuant to the priority of payments waterfall in the Indenture, rather than pro rata.  As an initial matter, Section 47(b) explicitly provides that rescission does not apply to the lawful portion of a contract to the extent it may be severed from the unlawful portion, and there is no suggestion that the waterfall provisions are either unlawful or unseverable.  Moreover, Section 47(b) of the ICA also

implicitly provides that invalid contracts may be enforced by bona fide third-party beneficiaries such as Lansuppe.

For these reasons, Lansuppe respectfully requests that the Court deny the Intervenors' Cross-Motion for Summary Judgment and grant Lansuppe's remaining request for relief, ordering the Trustee to distribute the proceeds of the liquidation in accordance with the priority of payments waterfall set forth in the Indenture.

## COUNTERSTATEMENT OF DISPUTED AND UNDISPUTED FACTS

### A.    At The Time Of Investment, The Intervenors Made A Calculated Decision To Accept Greater Risk In Exchange For Higher Yield

CDO notes are issued in tranches that have different levels of risk and provide for different returns on investment.  The lower the risk, the lower the return, and conversely, the higher the risk, the higher the return.  The Soloso CDO was no different, and the differing levels of risk associated with each tranche of notes was clearly spelled out in the CDO offering documents.  (*See* Decl. of Jonathan E. Pickhardt Ex. 1 at 18, 27-32, Dkt. No. 76-1.)

One way that CDOs create different levels of risk is through a "priority of payments" waterfall that directs the Trustee to use available funds to satisfy interest and principal payment obligations to senior noteholders before making payments to junior noteholders.   CDO indentures typically set forth a number of separate waterfalls—*e.g.*, one that governs the distribution of funds in the ordinary course during the life of the CDO; one that governs the distribution of funds when the CDO is performing poorly; and another that governs the distribution of funds upon the liquidation or final maturity date.  Once again, the Soloso CDO was no different.   Section 11.1(a)-(c) of the Indenture sets forth the priority of payments waterfall to be applied by the Trustee during the life of the CDO, while Section 11.1(d) sets forth the priority of payments waterfall to be applied upon the final maturity date, or following the

acceleration of maturity of the Notes.  (*See* Decl. of a Representative of Lansuppe Feeder, LLC Ex. A § 5.2(a), Dkt. No. 8-1.)  The offering documents for the Soloso CDO clearly explained that all interest and principal payments to Noteholders would be governed by the priority of payments waterfalls set forth in Section 11.1 of the Indenture.  (*See* Dkt. No. 76-1, at 18, 27-32.).

### B.    The Intervenors Initially Sought To Prevent The Liquidation Of The Trust Estate

On July 31, 2015, Lansuppe, in its capacity as the Requisite Noteholders, directed the Trustee to liquidate the Trust Estate pursuant to Section 5.4(iv) of the Indenture.  (Intervenors' Counterstatement to Lansuppe's SOMF ¶ 6, Dkt. No. 35.)  The Trustee informed the Noteholders that it would liquidate the Trust Estate by notice dated August 11, 2015.  (RSOMF[2] ¶ 30.)  After receiving this notice, 11 of the Intervenors (the "Mississippi Plaintiffs") filed suit against the Trustee in federal court in the Northern District of Mississippi to halt the liquidation (the "Mississippi Action").  (RSOMF ¶ 31.)[3]

The Mississippi Plaintiffs alleged that Notes were sold to a single NQP, Bank of Morton—which was not a party to the Mississippi Action—nearly ten years earlier in 2005. According to the Mississippi Plaintiffs, this sale gave rise to an obligation on the part of the Issuer to register as an investment company under the ICA, as well as an Event of Default under Section 5.1(e) of the Indenture, which occurs when "either of the Co-Issuers or the Trust Estate becomes required to register as an 'investment company' under the Investment Company Act" (the "Alleged 2005 Event of Default").  (RSOMF ¶ 32.)  The Mississippi Plaintiffs further took

---

[2]    "RSOMF" is used herein to refer to the Lansuppe's responsive Local Civil Rule 56.1 Statement of Material Facts on Motion for Summary Judgment.

[3]    The Mississippi Plaintiffs are Oxford University Bank; Citizens Bank & Trust Company of Marks; Coastal Commerce Bank; First Commercial Bank as Successor-in-Interest to Desoto County Bank; First State Bank; Guaranty Bank and Trust Company; Newton County Bank (now known as BankFirst Financial Services); The First, A National Banking Association; Copiah Bank, N.A.; Holmes County Bank and Trust Company; and PriorityOne Bank.  (*See* Lansuppe Representative Decl. Ex. E, Dkt. No. 8-5.)

the position that, as a matter of contractual interpretation, the occurrence of the Alleged 2005 Event of Default prevented liquidation of the Trust Estate without the prior approval of 100% of the Noteholders.  (*Id.*)

Following the commencement of the Mississippi Action, Lansuppe filed this trust instruction proceeding seeking, *inter alia*, a declaration that it was entitled to direct the liquidation of the Trust Estate under the plain terms of the Indenture notwithstanding the Alleged 2005 Event of Default.  (*See* Compl. ¶¶ 41-46, Dkt. No. 1.)  Lansuppe simultaneously filed a Motion for Summary Judgment by Order to Show Cause seeking an order granting the relief requested in its trust instruction proceeding.  (*See* Order to Show Cause for Summary Judgment, Dkt. No. 3.)  Pursuant to an Order of this Court, the Trustee delivered notice of this proceeding directly to the Mississippi Plaintiffs and Bank of Morton, and indirectly to all holders of Soloso Notes through The Depository Trust Company.  (*Id.*)

Following receipt of this notice, nine of the Mississippi Plaintiffs (the "Initial New York Intervenors")[4] intervened in this trust instruction proceeding seeking a stay, or in the alternative, opposing Lansuppe's Motion for Summary Judgment and filing a Cross-Motion for Summary Judgment of their own.  (*See* Dkt. Nos. 34, 36, 56.)  The Initial New York Intervenors once again argued that, as a matter of contractual interpretation, the Alleged 2005 Event of Default prevented liquidation without the prior approval of 100% of the Noteholders.  (Hr'g Tr. 53:1-22, Oct. 20, 2015.)  Additionally, they also argued that the Court was precluded from authorizing the liquidation of the Trust Estate because it would effectively waive a violation of the ICA.  (Mem. 17-21.)

---

[4]   The Initial New York Intervenors who originally intervened in this proceeding were Oxford University Bank; Citizens Bank & Trust Company; Coastal Commerce Bank; Guaranty Bank and Trust Company; BankFirst Financial Services as Successor-in-Interest to Newton County Bank; The First, A National Banking Association; Copiah Bank, National Association; and PriorityOne Bank.  (*See* Dkt. No. 33.).

In their Cross-Motion for Summary Judgment, the Initial New York Intervenors alleged, for the first time, that five more banks including four more Intervenors—First Commercial Bank, First State Bank, Holmes County and Trust Company, Bank of Kilmichael, and Commercial Bank (DeKalb)—were also NQPs at the time they purchased Soloso Notes.  (*See* Mem. at 2, 17-21.)  Three of these Intervenors are Plaintiffs in the Mississippi Action, but have never claimed to be NQPs in the context of that case.  (*See* Dkt. No. 8-5.)

The six alleged NQPs did not initially seek to intervene in the New York action. Nevertheless, an employee of each alleged NQP submitted an affidavit claiming that the NQP "owned and invested on a discretionary basis less than $25,000,000 in investments" at the time it purchased the Soloso Notes.  (*See* Dkt. Nos. 39, 47-48, 50-52.)  None of these affidavits provide any factual information regarding the bank's holdings or any clarification of what holdings are being included by the affiant as "investments" "owned and invested on a discretionary basis." (*See id*.)  Additionally, for at least three of the NQPs, the affiant was not even employed at the alleged time of purchase and provides no explanation of the steps taken to determine the bank's investments as of that date.  (*See* Dkt. Nos. 47, 50-51.)

## C.   The Intervenors Subsequently Consented To Liquidation Of The Trust Estate And Sought Pro Rata Distribution Of The Funds

A hearing was held on October 20, 2015, on Lansuppe's Motion for Summary Judgment and the Intervenors' Motion to Stay or Dismiss the Action in favor of the Mississippi Action. During that hearing, the Initial New York Intervenors abandoned their argument that, under the terms of the Indenture, the liquidation of the Trust Estate required the prior approval of 100% of the Noteholders following the occurrence of the Alleged 2005 Event of Default.  (Hr'g Tr. 20:21-21:11.)  Additionally, when pressed by the Court, the Initial New York Intervenors also

abandoned their argument that liquidation would effectively waive a violation of the ICA and concluded that the Trust Estate should be liquidated.  (*Id.* 55:15-56:5.)

Notwithstanding these concessions, the Initial New York Intervenors nevertheless argued that, as a result of the sale of Soloso Notes to NQPs, they are entitled to rescission of their agreement to purchase the Soloso Notes under the ICA and return of their investment.  (*Id.* 54:13-55:14.)  In light of this entitlement, the Initial New York Intervenors asserted that the proceeds of the liquidation of the Trust Estate should be distributed to Noteholders on a pro rata basis, rather than according to the priority of payments waterfall set forth in the Indenture.  (*Id.* 56:4-5.)

On October 23, 2015, five of the six alleged NQPs that had previously elected not to intervene in this case (notwithstanding being represented by the same lawyers as the Initial New York Intervenors) changed their mind, and sought leave to intervene from the Court based on the Memorandum of Law in Support of the Proposed Intervenors' Motion to Intervene previously filed by the Initial New York Intervenors.  (*See* Dkt. No. 87.)[5]

### D.    The Court Directed The Liquidation Of The Trust Estate And Ordered Further Briefing Regarding The Disposition Of The Funds

On October 26, 2015, the Court issued a Memorandum Opinion and Order granting that part of Lansuppe's motion for summary judgment that sought liquidation of the Trust Estate.  (Dkt. No. 95, at 2, 12.)  The Court reserved judgment on the remainder of Lansuppe's motion—that seeks distribution of the liquidation proceeds pursuant to the priority of payments waterfall

---

[5]   The five alleged NQPs who subsequently sought leave to intervene are Bank of Morton, Bank of Kilmichael, Holmes County Bank and Trust Company, First Commercial Bank as Successor-in-Interest to Desoto County Bank, and First State Bank.  (Dkt. No. 87.)  Despite joining the filing of an answer on November 4, 2015, (*see* Dkt. No. 99), Lansuppe notes that the Court has not yet issued an order granting leave for these NQPs to intervene.

in the Indenture—pending completion of the briefing of the Intervenors' Cross-Motion for Summary Judgment.  (*Id.* at 12.)

<u>**ARGUMENT**</u>

Under FED. R. CIV. P. 56(a), entry of summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).  "[W]here the movant fails to fulfill its initial burden of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, even if no opposing evidentiary matter is presented, for the non-movant is not required to rebut an insufficient showing." *Giannullo v. City of N.Y.*, 322 F.3d 139, 140-41 (2d Cir. 2003) (citations omitted) (internal quotation marks omitted).

When a nonmovant shows by affidavit or declaration that, "for specified reasons, it cannot present facts essential to justify its opposition," the court may:  (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or take discovery; or (3) issue any other appropriate order.  FED. R. CIV. P. 56(d).  In the Second Circuit, "when a party facing an adversary's motion for summary judgment reasonably advises the court that it needs discovery to be able to present facts needed to defend the motion, the court should defer decision of the motion until the party has had the opportunity to take discovery and rebut the motion." *Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 386 (2d Cir. 2001).

**I.   THERE IS NO PRIVATE RIGHT OF ACTION UNDER SECTION 47(B) OF THE ICA**

For the reasons set forth in Lansuppe's Reply Brief, the Intervenors have no private right of action under Section 8 or Section 7 of the ICA, requiring registration of investment companies

and prohibiting sale of securities absent registration, respectively.  (Reply Br. 7-8, Dkt. No. 74.)
At the hearing on October 20, 2015, the Intervenors clarified that they do not seek to bring an
action directly under those sections, but instead, seek rescission under Section 47(b) of the ICA
(15 U.S.C. § 80a-46(b)(1)), based on the theory that their agreements to purchase Soloso Notes
were contracts "made [in], or whose performance involves, a violation" of the ICA.  (*See* Hr'g
Tr. 27:13-21.)  This argument fares no better.

Since the Supreme Court's decision in *Alexander v. Sandoval*, 532 U.S. 275 (2001), **every**
court to consider a claimed private right of action pursuant to Section 47(b) under the *Sandoval*
rubric has squarely rejected the Intervenors' argument that Section 47(b) creates a free-standing
private right of action.  Instead, courts have routinely found that Section 47(b) merely describes a
remedy available under the ICA for substantive violations that independently create a private
right of action.  *See Smith v. Oppenheimer Funds Distrib., Inc.*, 824 F. Supp. 2d 511 (S.D.N.Y.
2011) ("*Oppenheimer Funds*") (declining to recognize a private right of action under Section
47(b) of ICA); *Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co. (U.S.A.)*,
677 F.3d 178, 187 (3d Cir. 2012) (adopting the conclusion that "Section 47(b) creates a remedy
rather than a distinct cause of action or basis for liability" and rejecting plaintiffs' "effort to
insinuate their excessive fees claim [under Section 36(b)] into Section 47(b)"), *cert. denied* 133
S. Ct. 529 (2012); *Steinberg v. Janus Capital Mgmt., LLC*, 457 F. App'x 261, 267 (4th Cir. 2011)
("Crucially … there is no private cause of action to enforce Section 47(b)."); *Smith v.
Franklin/Templeton Distribs., Inc.*, 2010 WL 2348644, at *7 (N.D. Cal. Jun. 8, 2010)
("*Franklin/Templeton*") ("By its terms, § 47(b) provides a remedy … rather than a distinct cause
of action or basis for liability."); *Laborers' Local 265 Pension Fund v. iShares Trust*, 2013 WL
4604183, at *9 (M.D. Tenn. Aug. 28, 2013) (rejecting the argument that "Section 47(b)'s

authorized remedy indicates a right of action" because "it is settled law in this circuit that a remedy alone does not create a substantive right"), *aff'd*, 769 F.3d 399 (6th Cir. 2014); *Stegall v. Ladner*, 394 F. Supp. 2d 358, 378 (D. Mass. 2005) (parties concede that "ICA § 47(b) provides a remedy rather than a distinct cause of action or basis of liability"); *Mutchka v. Harris*, 373 F. Supp. 2d 1021, 1027 (C.D. Cal. 2005) ("The parties agree that Section 47(b) is remedial in nature and does not itself provide a cause of action.").[6]  Consequently, the lack of a private right of action under Sections 7 and 8 of the ICA dooms the Intervenors' effort to invoke the remedies articulated in Section 47(b) of the ICA.

The reasoning of Judge Sands in *Oppenheimer Funds* is particularly instructive in this case.  In that decision, in declining to find that an independent private right of action exists under Section 47(b), the court looked to three principles taken from post-*Sandoval* Second Circuit decisions that declined to find a private right of action under other sections of the ICA.[7]  *First*, "Congress's explicit provision of a private right of action to enforce one section of a statute suggests that omission of any explicit private right to enforce other sections was intentional." *Oppenheimer Funds*, 824 F. Supp. 2d at 518 (quoting *Olmsted*, 283 F. 3d at 433).  *Second*,

---

[6]  The Court in *Oppenheimer Funds* noted that three post-*Sandoval* decisions from other jurisdictions—*In re Regions Morgan Keegan Securities*, 743 F. Supp. 2d 744, 762 (W.D.Tenn.2010) ("*Morgan Keegan*"), *In re Mutual Funds Investment Litigation*, 384 F. Supp. 2d 873, 881 (D.Md. 2005) ("*Mutual Funds*"), and *Wiener v. Eaton Vance Distributors Inc.*, 2011 WL 1233131, at *12 (D. Mass. Mar. 30, 2011)—that arrived at contrary and erroneous conclusions did so by relying on "inapplicable pre-*Sandoval* authority in other circuits."  824 F. Supp. 2d at 520 n.3.  Moreover, it is worth noting that any discussion of a private right of action under the ICA in these cases is found in *dicta*, as each of these decisions actually rejected the claimed private right of action at issue.  *See Weiner*, 2011 WL 1233131, at *12 (rejecting an effort to graft a private right of action on to Section 36(a) of the ICA); *Morgan Keegan*, 743 F.Supp.2d at 762 (rejecting effort to bring claim under Section 47(b) of the ICA to rescind contract to which plaintiff was not a party); *Mutual Funds*, 743 F. Supp. 2d at 762 (rejecting claim for rescission based on "unlawful transactions made pursuant to [a] lawful contract[]," because the language of Section 47(b) only covers rescission of contracts that are unlawful at their formation).  Lansuppe is unable to locate a single post-*Sandoval* decision actually granting a private claim for rescission under Section 47(b) of the ICA.

[7]  The Second Circuit cases relied upon by the Court in *Oppenheimer Funds* are *Olmsted v. Pruco Life Insurance Co. of New Jersey*, 283 F.3d 429, 436 (2d Cir. 2002) (finding no private right of action in ICA §§ 26 and 27) and *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 117 (2d Cir. 2007) (finding no private right of action in ICA §§ 34(b), 36(a), and 48(a)).

"courts 'cannot ordinarily conclude that Congress intended to create a right of action where none was explicitly provided.'"  *Id.* (quoting *Bellikoff*, 481 F. 3d at 116).  *Third*, "[w]hen the text and structure of a statute unambiguously express an intent not to imply a private right of action, [courts] cannot consider 'the expectations that the enacting Congress had formed in light of the contemporary legal context.'"  *Id.* (quoting *Bellikoff*, 481 F. 3d at 117).

Applying these principles to Section 47(b) of the ICA, Judge Sands found that Congress had carefully allocated the enforcement authority under the ICA among the SEC and security holders, solely vesting the former with general enforcement rights under Section 42 of the ICA (15 U.S.C. § 80a-41), and the latter a narrowly tailored private right of action "for breach of fiduciary duty involving compensation paid by [a registered investment company] to its investment advisor." *Id.* (citing 15 U.S.C. § 80a-35(b)).  "Allowing section 47(b) to endow all the ICA's substantive violations with a private right of action … would override this careful allocation of remedies." *Id.*  Thus, for the same reasons that the Second Circuit refused to imply private rights of action under other provisions of the ICA, the court found that there was no private right of action under Section 47(b). *Id.* at 520.  In light of the conclusion reached by Judge Sands in *Oppenheimer Funds* and every other court to consider the issue under the *Sandoval* framework, the Intervenors have no basis to contend that they have a private right action under Section 47(b).[8]

---

[8]  Nor would the Intervenors succeed in analogizing to the Supreme Court's pre-*Sandoval* decision in *Transamerica Mortgage Advisors, Inc. v . Lewis*, 444 U.S. 11 (1979) ("*TAMA*"), where the Court found an implied private right of action under the similarly constructed Section 215 of the Investment Advisors Act of 1940 (the "IAA").  Rather, since the Court's decision in *Sandoval*, courts have routinely limited the holding of *TAMA* to its particular facts and have not construed it so as to undermine application of the *Sandoval* framework to Section 47(b).  Indeed, Judge Sands flatly rejected any application of *TAMA* to Section 47(b) in *Oppenheimer Funds* as has every other court to expressly consider the issue.  *See, e.g.*, *Santomenno*, 677 F. 3d at 186-187.

## II.     EVEN IF A PRIVATE RIGHT OF ACTION EXISTED UNDER SECTION 47(b), RESCISSION SHOULD NEVERTHELESS BE DENIED IN THIS CASE

Even if a private right of action existed under Section 47(b) of the ICA—which it does not—the Intervenors' claims are fatally flawed for *at least* four additional reasons, as explained below.

### A.     The Intervenors' Claims Are Barred By The Statutes Of Limitations And Repose

Were a private right of action to exist under Section 47(b) of the ICA, the Intervenors' claims under that private right of action would be time barred.  Section 47(b) does not contain an express statute of limitation or repose, so the applicable limitation periods must be derived from state or federal law, depending on which source provides a "closer fit" to the cause of action at issue.  *See Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1039 (2d Cir. 1992).[9]

Applying this analysis to an action for rescission under the analogous Section 215 of the Investment Advisers Act of 1940 ("IAA"), the Second Circuit has determined that the one year/three year limitations period applicable to various provisions of the Securities Act and Securities Exchange Act—which requires an action to be filed within one year of the date of discovery and no more than three years after the date of injury—is the appropriate limitations period.  *See id.* at 1039.[10]  The court reasoned that:

---

[9]   This analysis is broken down into a three-step process, whereby the Court:  (1) determines whether "federal interest in predictability and judicial economy" counsel the adoption of a uniform statute of limitations across state jurisdictions; (2) determines "whether this period should be derived from a state or federal source," with an eye toward "the danger of forum shopping," among other risks of borrowing state statutes of limitation; and (3) determines whether "an analogous federal source truly affords a 'closer fit' with the cause of action at issue than does any available state-law source."  *Id.* at 1034 (citations omitted) (internal quotation marks omitted).

[10]   While the Sarbanes-Oxley Act of 2002 extended the period to two years from discovery and five years from date of injury for claims sounding in fraud, *see* 28 U.S.C. § 1658(b), this Court has previously declined to extend the limitations period to non-fraudulent securities claims.  *See In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 196-97 (S.D.N.Y. 2003) (declining to apply Sarbanes-Oxley statute of limitations to claims that do not require a showing of fraudulent intent).  Even if this Court chose to apply the Sarbanes-Oxley limitations period, the date of injury is in 2005, making the Intervenors' counterclaims more than 5 years too late.

> The purposes behind the statutes are almost identical.  In fact, the Supreme Court has said that 'Congress intended the [IAA] to be construed like other securities legislation enacted for the purpose of avoiding frauds.'  Both sets of regulations operate in the same securities market context, proscribe similar conduct, and impose registration and disclosure requirements.

*Id.* (quoting *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 195 (1963)).  The same reasoning applies to Section 47(b) of the ICA, which was passed at the same time as the IAA, using identical language.[11]  *See Omega Overseas Partners, Ltd. v. Griffith*, 2014 WL 3907082, at *6 (S.D.N.Y. Aug. 7, 2014) (describing the ICA and IAA as "companion statutes" and observing that their legislative reports "refer to this [section] simply as 'the usual provision[] regarding the validity of contracts'" (alteration in original) (quoting S. REP. NO. 76-1775, at 20, 23 (1940)).  The Second Circuit in *Kahn* further determined that the date of accrual for an action for rescission is the date of execution on the contract sought to be rescinded.  *Kahn*, 970 F.3d at 1042; *see also Phx. Four, Inc. v. Strategic Res. Corp.*, 2006 WL 399396, at *6 (S.D.N.Y. Feb. 21, 2006).

Applied to the facts of this case, the limitations period on any available claims for rescission of the Indenture under Section 47(b) of the ICA thus ran many years ago.  The Intervenors allege that the nonqualified purchases occurred in 2005.  (Answer and Cross-Claim ¶ 16, Dkt. No. 56-2; Dkt. No. 35 ¶ 22.)  Applying a three year statute of repose, the last date to file suit was in 2008.[12]

---

[11]   Section 47(b) of the ICA was subsequently amended by the Small Business Investment Incentive Act of 1980, resulting in some differences with the IAA provision, but none of the changes relate in any way to the properly applicable statute of limitations for claims assertable under Section 47(b).

[12]   Even if the date of the Intervenors' purchases of the Soloso Notes were deemed the appropriate date of accrual—which it is not—none of those purchases occurred later than 2007 (*see* Intervenors' SOMF ¶¶ 1-8, Dkt. No. 55), meaning that the last date to file suit would have been at some point in 2010.  Thus, under any potentially applicable accrual date, the Intervenors' Answer and Cross-Claim, filed October 5, 2015 (or its complaint filed on August 15, 2015 if that were the operative pleading), is far too late to be considered timely.

Moreover, any argument that the statutes of limitations or repose should not be strictly applied—for example, by equitable tolling or based on the theory that Soloso's failure to register as an investment company was a continuing wrong warranting a later start date for the limitations period—is foreclosed.  *First*, the three year statute of repose—unlike a statute of limitations—cannot be equitably tolled.  *See P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 102-03 (2d Cir. 2004) ("[A] statute of repose begins to run without interruption once the necessary triggering event has occurred, even if equitable considerations would warrant tolling or even if the plaintiff has not yet, or could not yet have, discovered that she has a cause of action.").  Accordingly, because any claims available under Section 47(b) of the ICA are subject to a three-year statute of repose, equitable tolling does not apply.

*Second*, the applicability of the continuing wrong theory of accrual has been rejected in closely analogous circumstances by the Second Circuit, in favor of the commitment theory, whereby a claim accrues once plaintiff has committed to the transaction giving rise to the alleged harm.  In *Kahn*, the Second Circuit explained that the continuing wrong theory "is based primarily upon the impracticality and unfairness of requiring a plaintiff to institute his action before he can predict his damages," whereas the commitment theory is more appropriate when the parties have committed to subsequent performance of obligations at the outset of the contract, crystallizing the course of future harm.  *Kahn*, 970 F. 2d at 1039-1041.  There, the Second Circuit considered an argument that an investment adviser's failure to register under the IAA was a continuing wrong.  *Id.* at 1039.  Rejecting application of the continuing wrong theory, the Second Circuit observed that, while an investment adviser owes a continuing duty to the government to register, "he harms the purchaser of his investment advice at the time that he enters into a contract that commits the purchaser to pay for that advice."  *Id.* at 1041.  Similarly,

14

under that reasoning, an unregistered investment company required to register under the ICA would harm the purchaser of its notes (if at all) at the time it enters into a contract that commits the purchaser to pay for those notes.[13]   For the same reasons articulated in *Kahn*, this Court should reject the continuing wrong theory of accrual and apply a commitment theory of accrual, under which the limitations period started in 2005.

> **B.      Any Claim For Rescission Lies Against The Initial Purchaser (Or Another Seller), Not the Issuer**

It is not clear from the Intervenors' Cross-Motion whether they seek rescission of the Indenture or of their various purchase contracts.  In either case, the Intervenors' request for relief should be denied.

To the extent that the Intervenors are seeking rescission of the Indenture, and not their purchase contracts, that relief is barred because they are not a party to the Indenture.  *See* 15 U.S.C. § 80a-46(b)(2) (permitting "***any party***" to a contract formed in violation of the ICA to seek rescission); *see also Morgan Keegan*, 743 F. Supp. 2d at 762 ("[Section 47(b)] gives 'any party' to the [unenforceable] contract the right to seek rescission.  Plaintiffs argue that the underlying contract is the underwriting agreement between the Funds and Morgan Keegan.  Plaintiffs are not parties to the underwriting agreement and, therefore, may not assert a direct remedy under § 47(b).").

To the extent that the Intervenors are seeking rescission of their purchase contracts, their claim is also fatally flawed because the Intervenors entered into their purchase contracts with SunTrust Capital Markets, Inc. (or a subsequent seller in the secondary market), not the Issuer.  It

---

[13]    Additionally, the Intervenors assert that their claim accrued in 2005.  (*See* Mem. at 19, Dkt. No. 37 (describing the violation of the ICA as "occurr[ing] eight years before the payment Event of Default").  The Intervenors should not be permitted to change their position on the date of accrual now simply because their contractual arguments against liquidation have been rejected by this Court.

is well-settled New York law that "[a] claim for rescission cannot be maintained against a person who was not a party to the contract." *See Steinberg v. Sherman*, 2008 WL 2156726, at *7 (S.D.N.Y. May 8, 2008).  The Offering Memorandum makes clear that the Issuer did not sell the Notes directly to investors.  Instead, the Issuer sold all of its Notes on the Closing Date to the Initial Purchasers.  (Dkt. No. 76-1, at 71.)  The Initial Purchasers, in turn, "offered the Notes to prospective purchasers from time to time in individually negotiated transactions at varying prices to be determined in each case at the time of sale."  (*Id.*).  As a result, any purchase contract between the Intervenors and the Initial Purchasers is a separate contract from the Indenture and the performance of the purchase contract—even if a violation of the ICA—does not give rise to a rescission claim against the Issuer.

### C.    The Indenture Did Not Violate The ICA, Nor Does Its Performance Require A Violation Of The ICA

If Section 47(b) of the ICA could be read to create a private right of action, that private right of action would not apply to the Indenture.  Section 47(b) is narrowly targeted at contracts that are "made illegally or require[] illegal performance," not agreements—such as the Indenture—that are facially legal and do not require any illegal performance but that govern the violative acts that are alleged to have occurred.  *Omega Overseas Partners*, 2014 WL 3907082, at *3.  In *Omega Overseas Partners*, the court specifically considered the scope of an action for rescission under the analogous Section 215(b) of the IAA, but its reasoning would be equally applicable to Section 47(b) of the ICA if private rights of action under that section were to apply.

*First*, the court noted that "the title—'Validity of contracts'—indicates that § 215 targets problems in the formation of contracts and in the contents of contracts, and not in the actions taken pursuant to contracts."  *Id.* at *3.  The title of Section 47 of the ICA is identical.  Moreover, there is no allegation by Intervenors that the Indenture itself violates the ICA; indeed,

to the contrary, the Indenture expressly prohibits sales to NQPs.  (Dkt. No. 8-1 § 2.5(d).)  To the extent that the ICA was violated, that was done in *derogation of* the Indenture, not *because* of it, making Section 47(b) inapplicable.

*Second*, the court found that Section 215 closely tracks the common law principle that illegal contracts are unenforceable, including the principles set forth in the *Restatement (First) of Contracts* for illegal contracts.  *Id.*  It then determined that "[b]ecause § 215(b) codifies a pre-existing common-law principle, it should be read consistently with that principle," meaning that "under § 215(b), as under the common law, if an agreement can by its terms be performed lawfully, it will be treated as legal, even if performed in an illegal manner."  *Id.* at *4 (citations omitted) (internal quotation marks omitted).  Since the ICA was passed at the same time as the IAA, and Section 47(b) of the ICA was identical to Section 215(b) of the IAA at the time when both provisions were passed, it stands to reason that both codified the same common-law principle, and both should be read in a manner consistent with that background principle.[14] Thus, because the Indenture can be performed lawfully, it is not subject to Section 47(b).

*Third*, the court pointed to numerous precedents concerning a nearly identical clause in the Securities Exchange Act of 1934, finding that such provisions "address[] unlawful contracts and not unlawful transactions made pursuant to lawful contracts."  *Id.* at *4.  The cases cited there, as well as the decision in *Omega Overseas Partners*, provide a robust line of authority that

---

[14]    While the language of Section 47(b) of the ICA was modified in 1980, it in no way undermines its source in common-law principles.  Indeed, the legislative history for the 1980 Amendment indicates that the changes were "[t]o a certain extent" intended to "codif[y] case law under the present section, and its analogs in other securities laws, by requiring a court to examine the equities of the situation and the purposes of the act in connection with its decision."  H.R. REP. 96-1341, at 37 (1980).  That case law included established precedent limiting causes of action under those sections to contracts that were illegal in their formation, not contracts that were performed illegally.  *See, e.g.*, *Drasner v. Thomson McKinnon Secs., Inc.*, 433 F. Supp. 485, 501-502 (S.D.N.Y. 1977) (holding that Section 29(b) of the Securities Exchange Act "only renders void those contracts which by their terms violate the Act or the rules and regulations thereunder"); *Occidental Life Ins. Co. of N.C. v. Pat Ryan & Assocs., Inc.,* 496 F.2d 1255, 1266 (4th Cir. 1974) ("Section 29(b) merely makes explicit that which is implicit, i.e., the recognition of the doctrine of illegal bargains in the application of the securities laws.").

would preclude Section 47(b) from being construed to invalidate the facially lawful Indenture here simply because conduct that is alleged to have happened pursuant that agreement violated the ICA.[15]

### D.   Rescission Would Be Inequitable And Inconsistent With The Purposes Of The ICA

Finally, rescission should also be denied because it would be inequitable and inconsistent with the purposes of the ICA.  *See* 15 U.S.C. § 80a-46(b) (permitting enforcement of a contract that violates the ICA where "under the circumstances enforcement would produce a more equitable result than nonenforcement and would not be inconsistent with the purposes of [the Act]").

*First*, allowing the Intervenors to recover on a pro rata basis through rescission would produce a patently inequitable result.  The Intervenors made a calculated decision to invest in heavily subordinated Notes that paid a higher yield in exchange for the Intervenors assuming a greater risk of loss than senior Noteholders.  Having reaped the benefits of that higher yield for a period of years, the Intervenors should not be permitted to turn around and argue for pro rata recovery now that the risks they agreed to bear have finally materialized.  Pro rata recovery would be even more inequitable with respect to the six alleged NQPs, because it would reward them for purchasing Soloso Notes in violation of the express terms of the Indenture, which precludes sales to NQPs and requires purchasers to represent that they are in fact qualified purchasers.  (Dkt. No. 8-1 § 2.5(d), (*i*).)

---

[15]   The Court in *Omega Overseas Partners* also considered precedent from this district purportedly arriving at the contrary conclusion that Section 215(b) of the IAA covers not only invalid contracts, but valid contracts performed in a manner violative of the IAA.  After analyzing these decisions, the court determined that all except one of them never considered whether Section 215(b) went beyond facially invalid contracts, and the one exception relied on those decisions that failed to consider the issue without further analysis.  *Omega Overseas Partners*, 2014 WL 3907082, at *7.  As such, the court determined that they were devoid of persuasive weight.  *Id.* at *7-8.  For the same reason, they should be disregarded here.

*Second*, allowing rescission of the Indenture would be manifestly harmful to the objectives of the ICA, which are targeted at protecting the reasonable expectations of investors against manipulative conduct and self-dealing by investment managers associated with investment companies.  *See Capital Gains*, 375 U.S. at 186 (grouping the ICA in a series of acts passed in the wake of the 1929 market crash and resulting depression and stating that "[a] fundamental purpose, common to these statutes, was to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry"); *Hamilton v. Allen*, 396 F. Supp. 2d 545, 559 (E.D. Pa. 2005) ("[T]he overarching policy underlying the Investment Company Act is one of concern over self-dealing between the officers and directors of a mutual fund and its associated investment company.")  Rather than protecting investors, the relief sought by the Intervenors would undermine the reasonable expectations of market participants in the global capital markets, like Lansuppe.  If the relief sought by Intervenors were granted, no investor in an investment company exempt from registration under Section 3(c)(7) of the ICA could be confident that they would receive their bargained-for protections set forth in the agreements governing their investment.  Rather, if any nonqualified investor slipped through the cracks and purchased alongside them, *every investor* in their deal would be entitled to pro rata recovery up to the amount of their investment, effectively transferring to junior holders the benefits to which senior interest holders are rightfully entitled.  The *in terrorem* effect of such relief would spread well beyond the ICA, since similar investor restrictions apply under the federal securities laws for all privately placed securities, subjecting every private placement of securities to the risk of unwind based upon latent failures in the sale process.  Thus, even if the Intervenors were technically eligible for relief under the ICA—which they are not—the perilous implications of the relief sought would

itself be a basis to bar recovery under the equitable exception to rescission set forth in Section 47(b) of the ICA.

### III.   EVEN IF RESCISSION WERE GRANTED, THE PRIORITY OF PAYMENTS WATERFALL WOULD STILL GOVERN DISTRIBUTION OF THE FUNDS

Furthermore, even if the Intervenors were entitled to the remedy of rescission, any recoveries that were awarded would nonetheless be required to be distributed pursuant to the payment waterfall set forth under the Indenture, granting Lansuppe a priority in repayment over the Intervenors.

### A.   The Priority Of Payments Provisions Are Severable From Any Provision In The Indenture That Violates The ICA

To the extent that Section 47(b) of the ICA did provide Intervenors with a rescission remedy, it would be expressly limited to those portions of severable contracts that violate the ICA, and would not impact any lawful portions of the contract.  15 U.S.C. § 80a-46(b)(3)(A) ("This subsection shall not apply (A) to the lawful portion of a contract to the extent that it may be severed from the unlawful portion of the contract."); *see also Lanza v. Carbone*, 130 A.D.3d 689, 692 (2d Dep't 2015) (citation omitted) (finding that a court may "sever the illegal aspect [of a contract] and enforce the legal [aspect], so long as the illegal aspects are incidental to the legal aspects and are not the main objective of the agreement.").  Whether a contract is severable is a question of intent "to be determined from the language employed by the parties, viewed in the light of the circumstances surrounding them at the time they contracted."  *Id.* (quoting *Christian v. Christian*, 42 N.Y.2d 63, 73 (1977)).

Here, Section 13.7 of the Indenture expressly provides that "[i]n case any provision in this Indenture … shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby." (Lansuppe Decl. Ex. 1 § 13.7, Dkt. No. 8-1.)  Thus, consistent with the intent of the parties to the

Indenture, because the priority of payments provisions of the Indenture are severable and lawful, they remain enforceable, even if the Intervenors were entitled to seek rescission of other portions of the Indenture.  As a result, even if the Court decided that some portions of the Indenture were unenforceable and subject to rescission, Lansuppe would be entitled to have any amounts that were paid to investors pursuant to such a rescission remedy distributed pursuant to the lawful portions of the Indenture that remained, including the priority of payments provisions.  Pursuant to those provisions, Lansuppe, as a senior investor, would be entitled to recover the full amount of its outstanding principal, before any amounts were distributed to junior investors, including the Intervenors.  (*See* Dkt. No. 8-1 § 11.1(d).)

### B.    As A Bona Fide Purchaser, Lansuppe Is Expressly Permitted To Enforce The Priority of Payments Provisions In The Indenture

Furthermore, to the extent that Section 47(b) of the ICA provides a rescission remedy, it preserves the right of nonparties to enforce the contract provided that they acquired rights under the contract without knowledge of the facts that constituted the violation of the ICA.  *See* 15 U.S.C. § 80a-46(b)(1) (making such a contract "unenforceable by either party (or by a nonparty to the contract who acquired a right under the contract with [such] knowledge …)," and thereby implicitly reserving the right of a *bona fide* third-party beneficiary to enforce the contract notwithstanding any conflict with the ICA).

There is no allegation whatsoever that Lansuppe's holdings in Soloso Notes were acquired with knowledge of any allegation that Soloso Notes had been improperly sold to NQPs.  In fact, more than 90% of Lansuppe's holdings—or more than $125 million in Soloso Notes— were acquired before Lansuppe or its investment advisor became aware of allegations that a single investor, Bank of Morton, had claimed to be an NQP.  (Declaration of a Representative of Lansuppe Feeder, LLC ¶ 5, Nov. 5, 2015.)  Since the overwhelming majority of Lansuppe's

Notes were acquired without knowledge of the facts alleged to constitute violations of the ICA, Lansuppe is entitled to enforce its rights as a Noteholder under the Indenture, including its right to receive distributions following the liquidation in accordance with the priority of payments provisions in the Indenture.  (*See* Dkt. No. 8-1 § 11.)  As such, regardless of the outcome of the Intervenors Section 47(b) claim, Lansuppe is entitled to payment from the proceeds of the liquidation ahead of the Intervenors.

## IV.    EVEN IF THE FOREGOING LEGAL ISSUES WERE NOT DISPOSITIVE, THE FACTUAL RECORD NEVERTHELESS PRECLUDES SUMMARY JUDGMENT

In light of the legal issues raised above—which are fatal to the Intervenors' claims— there is no need for the Court to consider the underlying factual record.  Were the Court to do so, however, it would quickly become apparent that the Intervenors' request for summary judgment should be denied, because key facts underlying the Intervenors' claims are not adequately supported by the existing factual record.

For example, the only purported "evidence" put forward by the Intervenors to establish that the alleged NQPs are in fact NQPs are six self-serving, boilerplate, and entirely conclusory affidavits from bank employees that simply track the statutory definition of an NQP.[16]  None of the affidavits provide any information regarding the banks' holdings, or what is being counted as a "discretionary investment."  Moreover, a number of the affidavits are clearly hearsay, because the affiants were not employed by the alleged NQPs at the time of purchase and provide no explanation of the basis for their purported knowledge of the banks' holdings prior to the commencement of their employment.  (*See*, *e.g.*, Dkt. Nos. 47, 50.)  Conclusory legal statements of this nature, founded on hearsay, have little or no evidentiary weight.  *See Epstein v. Kemper*

---

[16]   Specifically, each affidavit states in relevant part:  "When [Alleged NQP] purchased the notes, [Alleged NQP] owned and invested on a discretionary basis less than $25,000,000 in investments."  (Intervenors' SOMF ¶ 13, Dkt. No. 55.)

*Ins. Cos.*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002) ("Statements in an affidavit or Rule 56.1 statement are inappropriate if they are not based on personal knowledge, contain inadmissible hearsay, are conclusory or argumentative, or do not cite to supporting evidence.").  Finally, any evidentiary weight these affidavits may have is overcome by years of contrary conduct on the part of the alleged NQPs, who have repeatedly held themselves out as qualified purchasers in order to purchase millions of dollars of notes issued by TruPS CDOs such as Soloso.[17]

Additionally, to the extent the underlying facts matter—and they do not—summary judgment in favor of the Intervenors would be premature, because their claims are predicated on numerous material disputed facts about which Lansuppe has not yet had an opportunity to take discovery, including the following:

- **Were any of the alleged NQPS actually NQPs?**  As explained above, the evidence submitted by the Intervenors is not sufficient to establish that any of the alleged NQPs were actually NQPs at the time they purchased Soloso Notes.  Moreover, the circumstances in which the alleged NQPs came forward in this litigation raises serious questions about the credibility of their claims.  The first alleged NQP to come forward, Bank of Morton, failed to raise its status as an NQP for nearly 10 years following its purchase of the Notes.  (*See* RSOMF ¶ 24.)  Meanwhile, the remaining five alleged NQPs did not claim to be NQPs until Lansuppe filed this action, notwithstanding the fact that three of those banks were plaintiffs in the previously filed Mississippi Action.  *See supra* 6-7.

- **Did Soloso have a reasonable belief that alleged NQPs were qualified purchasers?**  In regulations promulgated under the ICA, the Securities and Exchange Commission has clarified that "[t]he term 'qualified purchaser' as used in section 3(c)(7) of the Act [15 U.S.C. 80a-3(c)(7)] means any person that meets the definition of qualified purchaser in section 2(a)(51)(A) of the Act [15 U.S.C. 80a-2(a)(51)(a)] and the rules thereunder, or that [a Section 3(c)(7) Company or person acting on its behalf] ***reasonably believes meets such definition.***"  17 C.F.R. § 270.2a51-1(h) (emphasis added).  Accordingly, even if one

---

[17]  For example, Bank of Kilmichael, which claims to have purchased $350,000 in Soloso Notes in 2005, had invested more than $2.8 million in TruPS CDOs as of December 2013 and First State Bank (another alleged NQP), which claims to have purchased $1 million of Soloso Notes in 2007, had invested more than $2.25 million in TruPS CDOs as of December 2013.  *See* Andrew R. Johnson, *Zions Not Only Bank to Be Hit by Volcker CDO Impact*, WALL ST. J. (Dec. 17, 2013 4:31 PM), http://blogs.wsj.com/moneybeat/2013/12/17/zions-not-only-bank-to-be-hit-by-volcker-cdo-impact/.  In order to invest in each TruPS CDO, Bank of Kilmichael and First State Bank would have been required to represent that they were qualified purchasers under the ICA.

of the alleged NQPs was in fact an NQP at the time of purchase, the Issuer may not be required to register as an investment company under the ICA if it or a person acting on its behalf reasonably believed that the NQP was a qualified purchaser..  The myriad of contractual provisions in the Indenture requiring investors to be qualified purchasers (*see, e.g.*, Dkt. No. 8-1 § 2.5(d) ("No Note … shall be sold or transferred … unless the purchaser or transferee is a Qualified Purchaser."); *id.* § 2.5(*i*) ("Each transferee of a Note … will be deemed to represent at time of transfer that the transferee … is a Qualified Purchaser.")), suggest that the Issuer may well have had the requisite reasonable belief.

- **Is Soloso eligible for exemptions from registration other than those under Section 3(c)(7)?**  The ICA contains numerous exemptions from the registration requirement other than the exemptions specified in Section 3(c)(7) of the ICA.  For example, under Section 3(c)(1) of the ICA, an issuer "whose outstanding securities (other than short-term paper) are beneficially owned by not more than one hundred persons and which is not making and does not presently propose to make a public offering of its securities" is exempt from the definition of investment company and the registration requirements of the ICA.  At this juncture, evidence in the record supports a finding of only 14 beneficial noteholders—the 12 Intervenors, nonparty Commercial Bank (DeKalb),[18] and Lansuppe—and there is no evidence of a public offering of securities by Soloso, so it is entirely possible that the Issuer qualifies for this exemption.

## CONCLUSION

For the foregoing reasons, Lansuppe respectfully submits that the Intervenors' Cross-Motion for Summary Judgment should be denied, and that the Court should grant summary judgment in favor of Lansuppe on the remainder of its Motion by issuing an order (a) declaring that the proceeds of the liquidation of the Trust Estate are to be distributed in accordance with the priority of payments set forth in Article XI of the Indenture and (b) instructing the Trustee to administer the distribution of proceeds from the liquidation of the Trust Estate in accordance therewith.

Given the fundamental legal flaws inherent in each of the three arguments advanced by the Intervenors in this case, and given the dubious nature of the evidence put forward by the Intervenors in support of their claims, pending the Court's ruling on the parties' summary

---

[18]   The Declarations submitted by the Intervenors, (Dkt. Nos. 39-42, 44-53), do not make clear whether the banks currently hold the notes, and if so, whether they hold the same positions as they did on the purchase date.  Absent clarification of this point, the record is unclear as to whether even all 14 of these beneficial noteholders exist.

24

judgment motions, Lansuppe expressly reserves its right to seek an order requiring the Intervenors to pay the costs of this litigation.  Such an order is expressly provided for under Section 5.16 of the Indenture, which permits the Court "in its discretion [to] assess reasonable costs, including reasonable attorneys' fees, against any party litigant … having due regard to the merits and good faith of the claims or defenses made by such party litigant."


DATED:        New York, New York        Respectfully submitted,
              November 5, 2015
                                        QUINN EMANUEL URQUHART &
                                        SULLIVAN, LLP


                                        By: _____
                                            Jonathan E. Pickhardt
                                            *jonpickhardt@quinnemanuel.com*
                                            Andrew S. Corkhill
                                            *andrewcorkhill@quinnemanuel.com*
                                            Blair A. Adams
                                            *blairadams@quinnemanuel.com*


                                            51 Madison Avenue, 22nd Floor
                                            New York, New York 10010
                                            (212) 849-7000

                                            *Attorneys for Plaintiff*
                                            *Lansuppe Feeder, LLC*

25