**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**LANSUPPE FEEDER, LLC**

                    **Plaintiff,**

     **vs.**

**WELLS FARGO BANK, NATIONAL**
**ASSOCIATION, as Trustee for Soloso CDO**
**2005-1 LTD.**

                    **Defendant,**

     **and**

**SOLOSO CDO 2005-1 LTD.,**

                    **Nominal Defendant,**

     **and**

**OXFORD UNIVERSITY BANK;**
**CITIZENS BANK & TRUST COMPANY;**
**COASTAL COMMERCE BANK;**
**GUARANTY BANK AND TRUST**
**COMPANY; BANKFIRST FINANCIAL**
**SERVICES as Successor-in-Interest to**
**Newton County Bank; THE FIRST, A**
**NATIONAL BANKING ASSOCIATION;**
**COPIAH BANK, NATIONAL**
**ASSOCIATION; PRIORITYONE BANK;**
**BANK OF MORTON; BANK OF**
**KILMICHAEL; HOLMES COUNTY**
**BANK AND TRUST COMPANY; FIRST**
**COMMERCIAL BANK as Successor-in-**
**Interest to Desoto County Bank; and FIRST**
**STATE BANK.**

                    **Intervenors.**

**Case No. 1:15-cv-07034 (LTS)**

**REPLY MEMORANDUM IN SUPPORT OF THE INTERVENORS'**
**CROSS MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ............................................................................................. 1

II. ARGUMENT ................................................................................................................... 2

A.   The Proceeds of Liquidation Should Not be Distributed Per the Waterfall. .......................... 2

    1.   A Waterfall Distribution Enforces a Contract Whose Performance Violates the ICA. ........ 3
    2.   Lansuppe Holds Notes with Knowledge of the Violation. .................................................. 4
    3.   The Equities Bar Enforcement. .......................................................................................... 5

B.   There is No Genuine Dispute of Material Fact Regarding Violation of the ICA. ................... 6

    1.   Intervenors' Evidence is Competent and Undisputed. ........................................................ 6
    2.   Soloso Does Not Qualify for Any Other Exemptions Under the ICA. ................................ 8
       a.   Soloso has failed to show that it qualifies for an 3(c)(1) exemption from the ICA. ........ 8
       b.   Soloso cannot defeat summary judgment based on the asset-backed security
          exemption. ..................................................................................................................... 9

C.   There are No Legal Barriers to Intervenors' Cross-Claims. ................................................. 12

    1.   Intervenors Have a Private Right of Rescission Against Soloso for Failure to Register
       Under the ICA. ................................................................................................................. 12
    2.   Intervenors' Claims are Not Time-Barred. ...................................................................... 16
    3.   Intervenors' Claims for Rescission and Other Relief Lie Against the Issuer. .................. 16

III. CONCLUSION .............................................................................................................. 17

# TABLE OF AUTHORITIES

**CASES**

*Alexander v. Sandoval*, 532 U.S. 275, 293 (2001) ..................................................................13, 14, 15, 16

*Avnet, Inc. v. Scope Industries*, 499 F.Supp. 1121, 1127 (S.D.N.Y. 1980) ................................................ 13

*Blatt v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 916 F.Supp. 1343, 1349-50 (D. N.J. 1996)................................ 13

*Bloor v. Shapiro*, 32 B.R. 993, 1002 (S.D.N.Y. 1983)................................................................ 16

*Carr v. Equistar Offshore, Ltd.*, 1995 WL 562178, *14 (S.D.N.Y. 1995)................................................ 13

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). ................................ 11

*Clark v. Rameker*, 134 S. Ct. 2242, 2248 (2014)........................................................................ 15

*Cogan v. Johnston*, 162 F. Supp 907, 909 (S.D.N.Y. 1958) ............................................................ 13

*Corley v. United States*, 556 U.S. 303, 314 (2009) .................................................................... 15

*Distribution Services, Ltd. v. Eddie Parker Investments, Inc.*, 897 F.2d 811 (5th Cir. 1990) .................................... 16

*Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357, 362 (5th Cir. 1968). ........................................ 3

*Edwards v. Toys "R" Us*, 527 F. Supp. 2d 1197, 1201 (C.D. Cal. 2007) ................................................ 7

*Krome v. Merrill Lynch Co.*, 637 F. Supp. 910, 918 (S.D.N.Y. 1986), *opinion vacated in part on other grounds*, 110 F.R.D. 693 ........................................................................................................ 13

*Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1207 (N.D. Cal. 2012) ........................................ 7

*Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970) ..............................................................15, 16

*Omega Overseas Partners, Ltd. v. Griffith*, ........................................................................3, 4

*Reg'l Properties, Inc. v. Fin. & Real Estate Consulting Co.*, 678 F.2d 552, 561 (5th Cir. 1982) .................................3, 4

*Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997).......................................................... 6

*Searles v. First Fortis Life Ins. Co.*, 98 F. Supp. 2d 456, 461 (S.D.N.Y. 2000).......................................... 6

*SEC v. CMKM Diamonds, Inc.*, 729 F.3d 1248 (9th Cir. 2013) ........................................................ 17

*SEC v. Midland Basic, Inc.*, 283 F.Supp. 609 (D.S.D. 1968)............................................................ 8

*Securities and Exchange Commission v. Ralston Purina Co.*, 346 U.S. 119 (1953)........................................ 8

*Slomiak v. Bear Stearns & Co.*, 597 F. Supp. 676, 682 (S.D.N.Y. 1984) ................................................ 3

*Smith v. Oppenheimer Funds Distributor, Inc.*, 824 F. Supp. 2d 511 (S.D.N.Y. 2011)....................................14, 15, 16

*State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) ........................................................................ 15

*Transamerica Mortgage Advisors, Inc. v. Lewis* (*TAMA*), 444 U.S. 11, 15 (1979) ............................................14, 15, 16

*United States v. Rx Depot, Inc.*, 438 F.3d 1052, 1057 (10th Cir. 2006) ................................................ 15


**STATUTES**

15 U.S.C. § 80a-7(a)(1)............................................................................................ 17

15 U.S.C. 80a-1(b)(1) ............................................................................................ 6

15 U.S.C.A. § 80a-43 ............................................................................................ 16

15 U.S.C.A. § 80a-46(b)(2) ........................................................................................ 13


**OTHER AUTHORITIES**

Am. Bar Ass'n Section of Bus. Law, 1999 WL 235450, at *21 (S.E.C. No - Action Letter Apr. 22, 1999)...................... 7

H.R. 1341, 96th Cong., 2d Sess. 28–29 (1980) ........................................................................ 13

H.R. 1341, 96th Cong., 2d Sess. 28–29 (1980), reprinted in 1980 U.S.C.C.A.N. 4810–11.................................... 13

https://cdr.ffiec.gov/public/............................................................................................................................ 7

**RULES**

Federal Rule of Civil Procedure 56(d) ....................................................................................................... 4

**REGULATIONS**

17 C.F.R. § 255.10 ..................................................................................................................................... 11
17 C.F.R. § 255.10(a)(1) (2015) ................................................................................................................ 10
17 C.F.R. § 255.10(d)(6)(i)(2015) ............................................................................................................. 11
17 C.F.R. § 255.10(d)(6)(i)(E) (2015) ...................................................................................................11, 12
17 C.F.R. § 255.16 ..................................................................................................................................... 12
17 C.F.R. § 270.2a51-1(h) ............................................................................................................................ 7
17 C.F.R. § 270.3a-7(a) ............................................................................................................................... 9
17 C.F.R. § 270.3a-7(b)(2) ........................................................................................................................ 10
17 C.F.R. §255.10(b)(1)(i) (2015) ............................................................................................................. 10

Intervening Defendants, Oxford University Bank; Citizens Bank & Trust Company; Coastal Commerce Bank; Guaranty Bank and Trust Company; BankFirst Financial Services as Successor-in-Interest to Newton County Bank; The First, A National Banking Association; Copiah Bank, National Association; PriorityOne Bank; Bank of Morton; Bank of Kilmichael; Holmes County Bank and Trust Company; First Commercial Bank as Successor-in-Interest to Desoto County Bank; and First State Bank (the "Intervenors"), through undersigned counsel, Jones Walker LLP and Mavronicolas & Dee, LLP, submit this reply memorandum in support of their cross-motion for summary judgment.

## I. PRELIMINARY STATEMENT

Both Lansuppe Feeder, LLC ("Lansuppe") and Soloso CDO-2005-1 Ltd. ("Soloso") fail squarely to address the central issue in this case - that the sale of Notes of the Soloso 2005 CDO to Non-Qualified Purchasers violates the registration requirements of Sections 7 and 8 of the Investment Company Act of 1940 (the "ICA") thus rendering the Indenture unenforceable. Neither Lansuppe nor Soloso raises any genuine dispute that the Notes were purchased by Non-Qualified Purchasers and do not dispute this violates the ICA. Rather, Lansuppe and Soloso cast about for any number of exceptions to sweep away this clear violation. None of these succeed.

Lansuppe pleads with the Court to look to the equities' safe harbor in Section 47 to rescue their claim to enforce the Indenture, yet do nothing to establish that the equities should favor over small community banks a large private equity feeder fund that possibly purchased the bulk of its notes at a discount after the 2008 financial crisis.

Soloso points to industry standard procedures for ensuring ICA compliance not endorsed by the Securities and Exchange Commission that purportedly allow it to claim to have reasonably relied on underwriters and other parties not to sell to Non-Qualified Purchasers, yet

provide no documentation that these procedures were ever employed. The non-disputed evidence shows they were not.

More curiously, for the first time, Soloso claims the protection of other exemptions from registration never mentioned in the Offering Documents on which it offered the Notes and where it explicitly relied only on the Section 3(c)(7) exemption for sales of Notes exclusively to qualified purchasers. In any event, federal regulators have pronounced that one of these exemptions plainly does not apply to CDOs of TruPs such as this one and Soloso does nothing to show that the other exemption is available.

In the end, the plain violation of the ICA entitles the Intervenors to rescission of their purchases of the Notes so long as Soloso does not register as an investment company. Case law does not foreclose parties from pursuing a private right of action for rescission under the ICA. Doing so would render the remedy superfluous. While it is not clear whether an affirmative claim for rescission under the ICA is foreclosed due to limitations periods, the Intervening Banks are entitled to assert the claim as an affirmative defense to Lansuppe's attempt to liquidate the Trust Estate no matter any limitations period.

## II. ARGUMENT

### A.   The Proceeds of Liquidation Should Not be Distributed Per the Waterfall.

When the Court ordered liquidation, it reserved ruling on whether sales of Notes under the Indenture to Non-Qualified Purchasers violated the ICA. Intervenors raise this violation both as an affirmative defense and as a claim for rescission. Lansuppe's arguments against Intervenors' rescission claim are irrelevant to Intervenors' affirmative defense. Regardless of the merit of the rescission claim, the Court cannot enforce a contract in violation of the ICA—and distribution of the liquidated proceeds under the Indenture's waterfall constitutes enforcement.

1.  **A Waterfall Distribution Enforces a Contract Whose Performance Violates the ICA.**

Section 47(b)(1) of the ICA bars enforcement of "a contract that is made, or whose performance involves, a violation" of the ICA.  Here, the Indenture's performance involved a violation of the ICA from its first offering, because the Issuer failed to register as an investment company.  Cases dealing with a failure to register under the securities laws establish that this failure is fundamental and bars enforcement.  The case Lansuppe relies upon, *Omega Overseas Partners, Ltd. v. Griffith*, draws a comparison between Section 215(b) of the Investment Advisors Act and Section 29(b) of the Exchange Act.  2014 WL 3907082, at *5 (S.D.N.Y. Aug. 7, 2014).  Lansuppe argues that the Court should construe Section 47(b) in line with Section 215(b) of the Advisors Act and Section 29(b) of the Exchange Act.  But cases construing Section 29(b) of the Exchange Act support Intervenors' position.

For example, in *Reg'l Properties, Inc. v. Fin. & Real Estate Consulting Co.*, 678 F.2d 552, 561 (5th Cir. 1982), the Fifth Circuit held that the defendant's failure to register as a broker-dealer voided the brokerage agreements between the plaintiff and the defendant.  The Court found that even though the agreements did not violate the Exchange Act on their face, they were unenforceable under Section 29(b) of the Exchange Act:  "That these contracts, under different circumstances, could have been performed without violating the Act is immaterial."  *Id.*; *see also Slomiak v. Bear Stearns & Co.,* 597 F. Supp. 676, 682 (S.D.N.Y. 1984) (citing *Reg'l Properties* with approval and distinguishing between a contract performed by an unregistered entity and a contract performed by an entity that failed to provide required disclosures); *Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357, 362 (5th Cir. 1968).[1]

---

[1]Before oral argument on Lansuppe's motion, the Court asked the parties to address the Intervenors' standing.  Notably, *Eastside* holds that all that is required for standing under a claim for rescission under Section 29(b) of the Exchange Act based on a failure to register is that the plaintiffs be within the class of persons the Act

Cases dealing with unenforceability for failure to register are more analogous to this case than *Omega*, which considered unenforceability for fraud committed five years after the contract was executed. Furthermore, none of the cases *Omega* relies upon deal with a failure to register. As the Court held in *Reg'l Properties*, registration requirements are critical to carrying out the purposes of the securities laws, because it is through registration that "some discipline may be exercised over those who engage in the securities business…." 678 F.2d at 562. The Court should hold that Soloso's failure to register rendered performance of the Indenture inherently violative of the ICA, barring enforcement of the Indenture under Section 47(b)(1) of the ICA.

2.      **Lansuppe Holds Notes with Knowledge of the Violation.**

Lansuppe also argues that Section 47(b)(1) only bars enforcement by parties to the contract or non-parties who bought without knowledge of the violation. But Lansuppe admits that it acquired at least some portion of its Notes with knowledge of the sales to Non-Qualified Purchasers. (Docket No. 106, p. 21). Under the plain terms of the ICA, Lansuppe cannot avoid Intervenors' affirmative defense on this ground. Furthermore, the extent of Lansuppe's knowledge is a matter that Intervenors should be allowed to pursue in discovery. If the Court finds that Lansuppe's bona fide purchaser argument has any merit (and it does not), the Court should postpone grant of summary judgment to allow for discovery under Federal Rule of Civil Procedure 56(d). Rule 56(d) Declaration of Robert B. Bieck, Jr.

---

was designed to protect; there is no need to prove that the plaintiffs suffered a harm caused by the failure to register. *See Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357, 362 (5th Cir. 1968) ("it is sufficient to show merely that the prohibited transactions occurred and that appellants were in the protected class."). Given that Lansuppe essentially admits that Section 29(b) of the Exchange Act and Section 47(b) of the Investment Company Act should be read *in pari materia*, *Eastside* establishes Intervenors' standing. In any event, Intervenors as purchasers of Investment Company securities are within the very class the ICA protects.

3.        **The Equities Bar Enforcement.**

Section 47(b)(1) allows a court to enforce a contract whose performance involves a violation of the ICA if "under the circumstances enforcement would produce a more equitable result than nonenforcement…"   If the Court is inclined to resort to the equities, Intervenors ask that the Court defer deciding the motion to allow for discovery under Rule 56(d).   Intervenors have no way of knowing when, why and how Lansuppe invested in the Soloso 2005-1 CDO – facts that weigh heavily on whether it will be inequitable to refuse to enforce the waterfall.[2]

Regardless of whether 56(d) relief is granted, Lansuppe's argument on the equities fails. Lansuppe's argument on the equities is premised largely on the idea that Intervenors bought their Notes with full knowledge of the risks involved. (Docket No. 106, p. 18).   Lansuppe further argues that the six Non-Qualified Purchasers bought in violation of the Indenture, which prohibits sales to Non-Qualified Purchasers.   This argument ignores Intervenors' undisputed evidence that they were provided neither the offering circular nor the Indenture when they purchased the Notes.   (Docket Nos. 39-53).   Nor was any Intervenor required to represent that it was a Qualified Purchaser.   *Id*.   Surely if they had, Soloso would have come forward with this evidence.   The fact that it has not demonstrates that these Notes were sold without even the limited procedural safeguards envisioned by the Indenture.

If Soloso had registered as an investment company, there would have been greater controls to protect Intervenors.   Section 1 of the ICA explains that the ICA protects investors from securities issued by investment companies "without adequate, accurate, and explicit information, concerning the character [of the issued] securities and the circumstances, policies,

---

[2] Indeed, Lansuppe may have bought its Notes well after issuance and after the 2008 financial crisis at far less than 100 cents on the dollar and thus paid no premium for the rights enjoyed by holders of notes in the senior tranche, and looks forward to a windfall at the expense of the junior noteholders.

and financial responsibility" of the issuer.  *See* 15 U.S.C. 80a-1(b)(1).  A waterfall distribution after liquidation does nothing to advance this policy; in fact, it guarantees that other similar CDOs will have no fear in recklessly selling Notes to small community banks without informing the purchasers of the risks of these investments.  The Court should hold that the failure to register is so fundamental a violation of the ICA that enforcement of the Indenture contravenes the purpose of the ICA, and therefore, the equities do not allow enforcement.

**B.**     **There is No Genuine Dispute of Material Fact Regarding Violation of the ICA.**

**1.**     **Intervenors' Evidence is Competent and Undisputed.**

In moving for summary judgment and in opposing Lansuppe's motion, Intervenors presented affidavits from Non-Qualified Purchaser banks establishing that they were not qualified purchasers when they bought the Notes.  Specifically, an officer from each Non-Qualified Purchaser bank swore that when the notes were purchased, the bank owned and invested on a discretionary basis less than $25,000,000 in investments.  Lansuppe and Soloso characterize these affidavits as "self-serving, boilerplate, and conclusory."  A conclusory affidavit is one containing "bald assertions and legal conclusions."  *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997).  The amount of investments each bank owned is not a legal conclusion, but a fact.  Lansuppe also claims that some of the bank officers lack personal knowledge of these facts and therefore their declarations contain hearsay.  But each declarant states the office he holds within his bank and the duties that office entails, which include for each familiarity with the bank's holdings.  (Docket Nos. 39-53).  Under similar circumstances, courts have found this is sufficient to establish personal knowledge.  *See Searles v. First Fortis Life Ins. Co.*, 98 F. Supp. 2d 456, 461 (S.D.N.Y. 2000) ("Ms. Duvall's position with Fortis qualified her to review the relevant business materials in an official capacity and make sworn statements based upon those materials."); *see also Edwards v. Toys "R" Us*, 527 F. Supp. 2d 1197, 1201 (C.D. Cal.

2007) ("a corporate officer's 'personal knowledge and competence to testify are reasonably inferred from their position'").

Furthermore, this information is publicly available in the FDIC's call reports, which Intervenors have cited (Docket No. 80) and of which the Court may take judicial notice. *See* https://cdr.ffiec.gov/public/; *Kyung Cho v. UCBH Holdings, Inc.,* 890 F. Supp. 2d 1190, 1207 (N.D. Cal. 2012) (taking judicial notice of call reports). Critically, neither Lansuppe nor Soloso has come forward with any evidence to dispute these affidavits. If the call reports demonstrated something contrary to the declarants' assertions, the burden was on the parties opposing summary judgment to come forward with this evidence. They failed to do so, and the evidence is undisputed.[3]

Soloso and Lansuppe argue that they need discovery regarding whether Soloso had a reasonable belief that the Intervenors were all Qualified Purchasers under 17 C.F.R. § 270.2a51-1(h). The SEC has stated that the Issuer's procedures "must be designed to provide a means by which the Fund or other Relying Person (as opposed to the Seller) can make a reasonable determination that all of the purchasers of the Fund's securities were qualified purchasers at the time that they acquired the securities." Am. Bar Ass'n Section of Bus. Law, 1999 WL 235450, at *21 (S.E.C. No - Action Letter Apr. 22, 1999).

Here, the Indenture does require that Noteholders certify they are qualified purchasers, but Soloso made no effort to obtain these certifications for its own records. If it had, surely Soloso would have come forward with evidence demonstrating that the Non-Qualified Purchasers executed or otherwise certified that they were Qualified Purchasers. Soloso cannot

---

[3] Lansuppe's speculation at footnote 17 that Bank of Kilmichael and First State Bank represented in the purchase of other TruPs CDOs that they were qualified purchasers is unsupported by any evidence.

rely on terms of the Indenture that it did not enforce, and there is no genuine dispute of material

fact that Soloso had no reasonable belief.

2. **Soloso Does Not Qualify for Any Other Exemptions Under the ICA.**

Soloso complains that the Intervenors do not consider whether it may qualify for the

3(c)(1) and the Rule 3(a)(7) exemptions under the ICA.  The Intervenors did not raise these

exemptions in their cross-motion for the simple reason that the Issuer explicitly states in the

Offering Circular that:

> The Co-Issuers have not registered as an investment company under the
> Investment Company Act in reliance on the exception provided under Section
> 3(c)(7) thereof for companies whose outstanding securities are beneficially owned
> by **"Qualified Purchasers"** (as defined in Section 3(c)(7) of the Investment
> Company Act) and which do not make a public offering of their securities in the
> United States.

In no other place does the Offering Circular or Indenture purport to rely on any other exemption

from registration under the ICA.[4]

That said, the Issuer has the burden of proving that these exemptions apply and has not

done so.  *SEC v. Midland Basic, Inc.*, 283 F.Supp. 609 (D.S.D. 1968) (holding that the burden is

on the investment company to prove an exception from registration is available) (citing

*Securities and Exchange Commission v. Ralston Purina Co.*, 346 U.S. 119 (1953) (holding same

for an issuer to prove availability of an exception from registration under the Securities Act)).

*a.* ***Soloso has failed to show that it qualifies for an 3(c)(1) exemption from the ICA.***

The Issuer's actions in offering the securities show it cannot rely on the 3(c)(1)

exemption under the ICA.  The Issuer specifically relied only on the 3(c)(7) exemption when

offering securities.  Furthermore, the Issuer did not create procedural safeguards in the Indenture

---

[4] Section 2.5(j) of the Indenture makes an oblique reference to Section 3(c)(1) of the ICA, but that reference cannot
be reasonably interpreted as a statement that the Issuer is relying on the Section 3(c)(1) exemption from registration.

to comply with this 3(c)(1) exemption in spite of the sales to Non-Qualified Purchasers.  If the Issuer in fact relied on this exemption, it would have done so to ensure that Notes were sold to no more than 100 beneficial holders.

In any event, the Issuer admits it has not got the evidence to establish to the 3(c)(1) exemption.

        **b.**     ***Soloso cannot defeat summary judgment based on the asset-backed security exemption.***

The Offering Circular and the Indenture do not mention the Rule 3(a)(7) asset-backed securities exemption (the "ABS exemption") because on its face it does not apply.  A threshold requirement for the ABS exemption, which the Issuer fails to reference, is that only an Issuer that "does not issue redeemable securities will not be deemed to be an investment company."   17 C.F.R. § 270.3a-7(a).  Redeemable securities are those defined by the ICA as securities that can be redeemed at the option of the holder entitling the holder at that time to receive his "proportionate share" of the Issuer's net assets.  15 U.S.C. § 80a-2(a)(32).

In addition to the Notes, the Issuer issued Preferred Shares.  These shares are "equity in the Issuer," as defined by the Offering Circular for those shares.  Breckinridge Decl., Ex. A at 7.  Section 9.1 of the Indenture allows "Holders representing at least 66-2/3%" to choose to redeem those shares.   Those securities are redeemable thus barring the Issuer from relying on this exemption.

Second, as the Issuer points out, to qualify for the exemption, the Issuer must issue securities that must be rated "securities sold by the issuer or any underwriter thereof are **fixed income securities rated, at the time of the initial** sale, in one of the four highest-rated categories … by at least one nationally recognized statistical rating organization."  The preferred shares are equity securities, Breckinridge Decl., Ex. A at 7, and do not qualify as fixed income

under the definition in Rule 3(a)(7) because holders of Preferred Shares are not entitled to receive fixed payments of principal or interest as required by Rule 3(a)(7) to qualify as a fixed income security.  *See* 17 C.F.R. § 270.3a-7(b)(2) (emphasis added).  Rather the holders of the Preferred Shares are only entitled to "dividend" payments to the extent there is Excess Cash Flow or residual amounts available from the Trust Estate collateral after holders of the Notes receive their compensation.  *See* Breckinridge Decl., Ex. A at 3, 12-13.

The Preferred Shares were not rated at the time of initial sale.  The Issuer attaches to its Opposition brief the initial ratings by Moody's of the Notes issued by the Issuer.  In that document, Moody's specifically states that it did not rate the preferred shares and there is nothing in Offering Documents or the Indenture to suggest that the Preferred Shares were ever rated by a nationally recognized statistical rating organization.  *See* Rainier Decl., Ex. F at 1. (Docket No. 112).

Finally, even if application of the ABS exemption were not foreclosed for these reasons, rules promulgated by the SEC and the banking regulators following the passage of the Dodd-Frank Act prohibit the use of the ABS exemption for CDOs of TruPs.  Five federal banking and securities regulatory agencies have ruled jointly that typical CDOs of TruPs are not exempt from compliance with regulations under Section 619 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Volcker Rule").

Subpart C of the Volcker Rule prohibits banks from acquiring or retaining an ownership interest in a "covered fund," defined as an issuer that would be an investment company, but for the Section 3(c)(1) hedge fund or 3(c)(7) exclusive qualified person ownership exemptions.  *See* 17 C.F.R. § 255.10(a)(1) (2015); 17 C.F.R. §255.10(b)(1)(i) (2015).

The banking and securities regulators also took the position that otherwise "covered funds" that also met exemptions from the ICA other than under Sections 3(c)(1) or 3(c)(7) were not subject to the Volcker Rule. Breckinridge Decl., Ex. B at 1, 2. That raised the question of whether CDOs of TruPs might fit under the Rule 3(a)(7) ABS exemption from the ICA. *See id*.

In response, the banking and securities regulators concluded that the typical CDO of TruPs cannot meet the criteria for the ABS exemption from the ICA, based on the following analysis. An "ownership interest" in a covered fund means any equity, partnership or other similar interest. Breckinridge Decl., Ex. B, 17 C.F.R. § 255.10(d)(6)(i)(2015). "Similar interest" includes, among other things, an interest that provides for reduction of amounts payable by the covered funds based on losses arising from the underlying assets of the covered fund, such as an allocation of losses, write-downs or charge-offs of the outstanding principal balance, or reductions in the amount of interest due and payable on the interest. 17 C.F.R. § 255.10(d)(6)(i)(E) (2015). The regulators included debt tranches (both mezzanine and senior) in the definition of ownership interest as equity-like instruments (as opposed to fixed income under Rule 3(a)(7)(b)(2) required to maintain the ABS exemption) along with the equity tranche and determined there is no exemption under the ICA Rule 3(a)(7) ABS exemption for an ownership interest in securities such as CDOs of TruPs. The banking regulators issued a December 10, 2013 report, stating that CDOs of TruPs meet the definition of covered funds in the final Volcker Rule and must be divested under the Volcker Rule.[5]  17 C.F.R. § 255.10

Liquidation and a waterfall distribution of the proceeds flowing from an auction or other sale of the securities collateralizing the Soloso CDO 2005-1, as contemplated in the Indenture

---

[5]  This multi-agency interpretation of the ICA and related SEC rules is entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)..  *See also* Breckinridge Decl., Ex. B (Press Releases from regulatory agencies discussing the Final Rules).

and requested by Lansuppe here, are the very equity-like characteristics that concerned the regulators because they cause holders of notes in the junior tranches of a "covered fund" to share in the losses of the "covered fund."   The losses arising from the underlying assets, the effects of the interest rate swap or a liquidation and waterfall distribution contemplated in this action reduce the amount received, *i.e.*, the remaining cash is substituted due to the actions of the top tranches and thus subordinate tranches constitute an equity interest.   Thus, the definition of "ownership interest" in the Volcker Rule makes any instrument (such as the junior Notes here) subject to a reduction in the amount received (but not the amount owed) because of a shortfall of the cash flows of a TruPs issuer of an equity-equivalent ownership interest, not a fixed income interest, making the ABS exemption unavailable for issuers that issue these types of securities.[6]
*See* 17 C.F.R. § 255.10(d)(6)(i)(E) (2015).

**C.     There are No Legal Barriers to Intervenors' Cross-Claims.**

**1.     Intervenors Have a Private Right of Rescission Against Soloso for Failure to Register Under the ICA.**

When the ICA was adopted, Section 47 was identical to Section 215 of the Investment Advisors Act (the "IAA").[7]   In 1980, the Small Business Investment Incentive Act amended

---

[6] Ultimately the banking and securities regulators allowed community banks, such as the Intervenors, that purchased notes in these TruPs CDOs that qualified as "covered funds" under the Volcker Rule before the passage of the Rule to retain those holdings. 17 C.F.R. § 255.16; Breckinridge Decl., Ex. C at 5225-26. In issuing that Interim Rule though, the regulators were explicit that these "covered funds" could only qualify for the (3(c)(1) or 3(c)(7) exemptions from registration and no others.  Breckinridge Decl., Ex. C at 5225-26.  Accompanying the Interim Rule, the regulators supplied a non-exclusive list of "covered fund" issuers that were subject to this rule.  *Id.* at 5226, n.6  The list included Soloso.  *Id.* (Non-Exclusive List).

[7] As originally enacted, Section 47(b) read:

> Every contract made in violation of any provision of this title or of any rule, regulation, or order thereunder, and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this title, or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as

Section 47 to add the following language:  "To the extent that a contract described in paragraph (1) has been performed, a court may not deny rescission at the instance of any party unless such court finds that under the circumstances the denial of rescission would produce a more equitable result than its grant and would not be inconsistent with the purposes of this subchapter."  15 U.S.C.A. § 80a-46(b)(2).  The words "at the instance of any party" grant any party the right to sue for rescission of an unenforceable contract.  The plain language of the ICA grants a private right of action, and there is no need to go further.  But the legislative history to the 1980 amendment confirms this reading:  "The Committee wishes to make plain that it expects the courts to imply private rights of action under this legislation, where the plaintiff falls within the class of persons protected by the statutory provision in question."  H.R. 1341, 96th Cong., 2d Sess. 28–29 (1980), reprinted in 1980 U.S.C.C.A.N. 4810–11.

Many cases confirm that a private right of action exists for a claim, such as this one, for rescission under Section 47 of a contract made in violation of Sections 7 and 8.  *See, e.g., Blatt v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 916 F.Supp. 1343, 1349-50 (D. N.J. 1996); *Krome v. Merrill Lynch Co.,* 637 F. Supp. 910, 918 (S.D.N.Y. 1986), *opinion vacated in part on other grounds,* 110 F.R.D. 693; *Carr v. Equistar Offshore, Ltd.*, 1995 WL 562178, *14 (S.D.N.Y. 1995); *Avnet, Inc. v. Scope Industries*, 499 F.Supp. 1121, 1127 (S.D.N.Y. 1980); *Cogan v. Johnston*, 162 F. Supp 907, 909 (S.D.N.Y. 1958).  Lansuppe argues, however, that these cases are not good law in light of *Alexander v. Sandoval*, 532 U.S. 275, 293 (2001).

---

regards the rights of any person who, not being a party to such contract, shall
have acquired any right thereunder with actual knowledge of the facts by reason
of which the making or performance of such contract was in violation of any
such provision, rule, regulation, or order.

Aug. 22, 1940, c. 686, Title I, § 47, 54 Stat. 845.

*Sandoval* considered whether a plaintiff could bring a private right of action under Section 602 of Title VI for the disparate impact of the Alabama Department of Public Safety's decision to administer driver's license exams in English only. *Id.* at 278. The Court held that the language of Section 602 granted no such right and that, furthermore, Congress's grant of a private right of action under Section 601 showed that Congress did not intend for that right to exist under Section 602. The Court held, "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.* at 286 (quoting *Transamerica Mortgage Advisors, Inc. v. Lewis* (*TAMA*), 444 U.S. 11, 15 (1979)).

Section 47(b) states that rescission is available "*at the instance* of any party." This is not implied; it is express. Nonetheless, *Smith v. Oppenheimer Funds Distributor, Inc.*, 824 F. Supp. 2d 511 (S.D.N.Y. 2011), holds that "section 47(b) contains a remedy, but not a substantive right." *Id.* at 519. But this makes little sense; why would Congress grant a remedy with no right to seek that remedy?

The *Oppenheimer* court reasoned that Section 36(b) contains an express private right of action, and so Section 47(b) must not. *Id.* at 521. But Section 36(b) grants a plaintiff the right to restitution of one years' worth of excessive fees. Rescission as a remedy for a Section 36(b) violation is both incompatible with the restitution remedy granted and unnecessary. This should have been the basis for the *Oppenheimer* Court's ruling that a Section 36(b) violation cannot serve as the basis for a Section 47(b) rescission claim. Furthermore, the SEC has no remedy under Section 47(b), because it is only available to parties to the transaction; the SEC's remedies are an injunction and/or disgorgement.

*Oppenheimer*'s unsatisfactory answer is that if Congress wanted to provide a private right of action, it could have done so.  But *Oppenheimer*'s reading of Section 47(b)(2) renders the statute a nullity.   Under the Supreme Court's canons of statutory construction, this is not allowed.  *See Clark v. Rameker*, 134 S. Ct. 2242, 2248 (2014) ("'a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous.'" (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)).

Section 47(b)'s grant of the equitable power of rescission must carry the corresponding right to seek rescission.  *TAMA*, a 1979 case cited with approval in *Sandoval*, holds that Section 215 of the Investment Advisors Act (which is virtually identical to the pre-1980 version of Section 47(b)) "as implying an equitable cause of action for rescission or similar relief," and noted that its prior precedents implied the same from Section 29(b) of the Exchange Act.  444 U.S. at 19 (citing *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970)).  In fact, in *Mills*, the Supreme Court noted that Section 29(b) and its counterparts in the Holding Company Act, the Investment Company Act, and the Investment Advisors Act all allow a contract to be voidable at the option of the innocent party.  396 U.S. at 387.  Given that *Sandoval* cites *TAMA* with approval, the *Oppenheimer* court and others following its reasoning go too far holding that Section 47(b) carries no private right to seek equitable relief.  *Sandoval* certainly does not overrule *TAMA*, and *Oppenheimer*'s refusal to read the Investment Company Act's language *in pari materia* with the Investment Advisors Act is contrary to *Mills*.  *See State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) ("it is th[e] [Supreme] Court's prerogative alone to overrule one of its precedents"); *cf. United States v. Rx Depot, Inc.,* 438 F.3d 1052, 1057 (10th Cir. 2006) (holding that *Sandoval* did not require express private right of action for equitable relief under FDCA

when FDCA contains express grant of equitable power); *see* 15 U.S.C.A. § 80a-43 (granting similar grant of equitable power under Investment Company Act of 1940).

In sum, *Oppenheimer* and the cases following *Oppenheimer* carry *Sandoval* too far.  The Supreme Court has recognized that the Investment Advisors Act, the Investment Company Act, the Holding Company Act, and the Exchange Act---all of which contain almost identical language---contain a limited right of action for equitable relief.  *TAMA*, 444 U.S. at 19; *Mills*, 396 U.S. at 387.  The Court should hold that Intervenors have such a right.

Finally, it is worth noting that none of the cases following *Oppenheimer* disallow Section 47 to be used *defensively*.  Again, even if Intervenors' claim for affirmative relief fails, its defense against Lansuppe's claim succeeds.

### 2.     Intervenors' Claims are Not Time-Barred.

Both federal and New York state law hold that a defendant may raise "any claim arising out of the same transaction, even though an independent action by the defendant on the claim would be time-barred."  *Bloor v. Shapiro*, 32 B.R. 993, 1002 (S.D.N.Y. 1983) (applying New York law); *Distribution Services, Ltd. v. Eddie Parker Investments, Inc.*, 897 F.2d 811 (5th Cir. 1990) (holding that recoupment counterclaim not barred by statute of limitations under the federal Carriage of Cargo by Sea Act).  As discussed above, Intervenors' claim is both a defense to Lansuppe's claim and a cross-claim.   The claims arise out of the same Indenture. Accordingly, Intervenors may raise their defense and cross-claim though they would ordinarily be time-barred.

### 3.     Intervenors' Claims for Rescission and Other Relief Lie Against the Issuer.

The fact that the Intervenors purchased securities from underwriters does not absolve the Issuer from liability for rescission under the ICA.  Section 7 of ICA, on which the Intervenors' failure to register claims is based, provides that

> no investment company, unless organized or otherwise created under the laws of the United States or of a State, and no depositor or trustee of or underwriter for such a company not so organized or created, shall make use of the mails or any means or instrumentality of interstate commerce, **directly or indirectly**, to offer for sale, sell, or deliver after sale … any security of which such company is the issuer.

15 U.S.C. § 80a-7(a)(1) (emphasis added).  The ICA plainly forbids an illegally unregistered investment company, such as Soloso, from escaping liability for selling securities by using an underwriter to sell those securities directly to the public.  Such a sale plainly qualifies as an indirect sale by Soloso and thus the Intervenors have a right to look to Soloso to rescind those purchases.[8]  *c.f.  SEC v. CMKM Diamonds, Inc.*, 729 F.3d 1248 (9th Cir. 2013) (noting that for purposes of Section 5 of the Securities Act, which contains the same prohibition on the direct or indirect sale of unregistered securities, a seller for liability purposes is not limited to a person or entity that ultimately passes title to an unregistered security).

### III.  CONCLUSION[9]

For the foregoing reasons and the reasons in the Intervenors' Cross-Motion for Summary Judgment, the Intervenors respectfully request that the Court rule that the Issuer is required to register as an investment company under the ICA and that the failure to do so renders the

---

[8] The case cited by Lansuppe to support their position that the Intervenors cannot look to the Issuer for rescission has nothing to do with the securities laws, and does not address that issuers cannot offer or sell securities indirectly (through underwriters) in violation of the ICA and thus the Court should disregard it.

[9]  The Trustee's reference to fee shifting under the Indenture is a matter for another time, but the Intervenors note that it does not apply to non-parties to the Indenture, such as Lansuppe or the Intervenors, and in any event only applies if a party makes claims in bad faith.  As the Issuer attempts to grasp for any exemption it can find makes clear, the Intervenors' claims regarding a violation of the ICA were not made in bad faith.  The plain language of the fee shifting provision likewise forecloses its use here:  by its terms, it does not apply to suits – such as this one - initiated by "any Noteholder . . . holding in the aggregate more than 10% in aggregate principal amount of the Notes."  Indenture at §5.16.  Lansuppe holds over 10% of the principal amount of the Notes.

Indenture void and unenforceable and entitles the Intervenors to rescission of their purchases of the Notes.[10]

Respectfully submitted,

*/s/ Peter C. Dee*
Peter C. Dee
Gregori D. Mavronicolas
MAVRONICOLAS & DEE LLP
415 Madison Avenue, 18th Floor
New York, New York  10017
Telephone:  (646) 770-1256
Facsimile:  (866) 774-9005
pdee@mavrolaw.com
gmavronicolas@mavrolaw.com

*and*

Robert B. Bieck, Jr. (*Pro Hac Vice*)
Alexander N. Breckinridge, V (*Pro Hac Vice*)
JONES WALKER LLP
201 St. Charles Avenue, Suite 4900
New Orleans, Louisiana  70170
Telephone:  (504) 582-8202
Facsimile:  (504) 589-8202
rbieck@joneswalker.com
abreckinridge@joneswalker.com

---

[10] Due to the representations made by the Trustee in their Opposition to the Intervenors' cross-motion that they cannot obtain a list of beneficial Noteholders, the Intervenors abandon their request for such a list.

Kaytie M. Pickett (*Pro Hac Vice*)
JONES WALKER LLP
190 East Capitol Street, Suite 800 (39201)
Post Office Box 427
Jackson, Mississippi  39205-0427
Telephone:  (601) 949-4900
Telecopy:  (601) 949-4804
kpickett@joneswalker.com

*Attorneys for Intervenors Oxford University Bank; Citizens Bank & Trust Company; Coastal Commerce Bank; Guaranty Bank and Trust Company; BankFirst Financial Services as Successor-in-Interest to Newton County Bank; The First, A National Banking Association; Copiah Bank, National Association; PriorityOne Bank; Bank of Morton; Bank of Kilmichael; Holmes County Bank and Trust Company; First Commercial Bank as Successor-in-Interest to Desoto County Bank; and First State Bank.*

## CERTIFICATE OF SERVICE

THE UNDERSIGNED HEREBY CERTIFIES that on this 19th day of November, 2015, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system and served on all of those parties receiving notification through the CM/ECF system.

/s/ Peter C. Dee
Peter C. Dee