UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

LANSUPPE FEEDER, LLC,

        Plaintiff,

   -v-                                                        No.  15-CV-7034-LTS

WELLS FARGO BANK, NA,
*as trustee for Soloso CDO 2005-1 Ltd.*

        Defendant,

   and

SOLOSO CDO 2005-1 LTD.,

        Nominal Defendant,

   and

OXFORD UNIVERSITY BANK; CITIZENS
BANK & TRUST COMPANY; COASTAL
COMMERCE BANK; GUARANTY BANK
AND TRUST COMPANY; BANKFIRST
FINANCIAL SERVICES; THE FIRST, A
NATIONAL BANKING ASSOCIATION;
COPIAH BANK, NATIONAL ASSOCIATION;
& PRIORITYONE BANK; BANK OF
MORTON; BANK OF KILMICHAEL; HOLMES
COUNTY BANK AND TRUST COMPANY;
FIRST COMMERCIAL BANK; and
FIRST STATE BANK;

        Intervenors.

-------------------------------------------------------x

<u>MEMORANDUM OPINION AND ORDER</u>

        This trust instruction proceeding, in which Plaintiff Lansuppe Feeder, LLC

("Lansuppe" or "Plaintiff"), as the holder of more than two-thirds of a class of senior notes

issued by Nominal Defendant Soloso CDO 2005-1 Ltd. ("Soloso" or the "Issuer"), an issuer of collateralized debt obligations backed by investments in trust-preferred securities, seeks a court order directing Soloso's trustee, Defendant Wells Fargo Bank, NA ("Wells Fargo" or the "Trustee"), to liquidate and distribute Soloso's assets in accordance with certain provisions of the relevant trust indenture.  Intervenors, consisting of holders of junior notes, oppose Lansuppe's request for relief, contending among other things that Soloso is in violation of the Investment Company Act of 1940 (the "ICA"), 15 U.S.C. § 80a et seq., and that all noteholders are entitled to rescission of their investments or pro rata distribution of Soloso's assets.

The Court has subject matter jurisdiction of this action pursuant to 12 U.S.C. § 632.

This Memorandum Opinion and Order addresses the issues outstanding with respect to the parties' cross-motions for summary judgment.  The motion practice was commenced in September 2015 by Order to Show Cause in connection with Lansuppe's motion seeking the relief described above.  The Court thereafter granted a motion to intervene by certain of the junior noteholders,[1] and the Intervenors moved to dismiss or transfer the case to Mississippi in deference to previously-commenced litigation and cross-moved for summary judgment, seeking dismissal of Lansuppe's claim and rescission of their investments or pro rata distribution of the Soloso trust assets.  (Docket Entry No. 36.)  Following oral argument on October 20, 2015, the Court denied the Intervenors' motion for transfer or dismissal in favor of

---

[1] See Lansuppe Feeder, LLC v. Wells Fargo Bank, NA ex rel. Soloso CDO 2005-1 Ltd., 2015 WL 6455274 (S.D.N.Y. Oct. 26, 2015).  Additional junior noteholders moved to intervene and joined with the original group in an answer, cross-claims, and cross-motion practice, although the Court had never formally granted their motion to intervene.  The Court hereby grants their intervention motion, (Docket Entry No. 87), nunc pro tunc.

the Mississippi litigation and granted Lansuppe's motion to the extent of authorizing the Trustee to liquidate the Soloso trust assets and hold them pending further order of the Court. 2015 WL 6455274 (S.D.N.Y. Oct. 26, 2015). The Court reserved decision on the remaining aspects of the pending motion practice.

The Court has reviewed thoroughly all of the parties' submissions and arguments. For the reasons explained below, the Court now grants summary judgment in Lansuppe's favor and denies the Intervenors' cross-motion for summary judgment.

## BACKGROUND[2]

Soloso is a trust. (See Compl. ¶¶ 1, 15.) It issued Notes pursuant to the terms of an Indenture dated August 24, 2005. (See Pl. 56.1 St., Docket Entry No. 7, ¶ 1; see also Declaration of a Representative of Lansuppe Feeder, LLC, Docket Entry No. 8, Ex. A (the "Indenture").) The Notes were co-issued by Soloso and Soloso CDO 2005-1 Corp. ("Co-Issuer"). (Pl. 56.1 St. ¶ 1.) When the Notes were issued, they were initially purchased by Bear, Stearns & Co. Inc. and SunTrust Capital Markets, Inc. (the "Initial Purchasers"), and the Initial Purchasers were authorized to resell those assets pursuant to the Indenture. (See Indenture §§ 1.1, 2.5(b)(ix).) The trust issued Notes in several tranches, and holders of the different tranches

---

[2] The following facts are undisputed except as indicated. Facts recited as undisputed are identified as such in the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1 or drawn from evidence as to which there is no non-conclusory contrary factual proffer. Citations to the parties' respective Local Civil Rule 56.1 Statements, Docket Entry No. 7 ("Pl. 56.1 St."), Docket Entry No. 35 ("Intervenors' 56.1(b) St."), or Docket Entry No. 55 ("Intervenors' 56.1(a) St."), incorporate by reference the parties' citations to underlying evidentiary submissions. Facts drawn from the Complaint in this action (Docket Entry No. 1) cited in this memorandum order and opinion are uncontested in the Intervenors' Answer (Docket Entry No. 99) and are therefore deemed admitted.

of Notes have varying rights with respect to rates of return on the Notes and repayment of principal in the event of liquidation of the trust's assets. (Compl. ¶¶ 15-17, 22.) Lansuppe holds Class A-1 Notes, which have priority in payment of interest and principal, while the Intervenors hold Notes that earn a higher rate of interest but have distribution rights that are junior to those of the Class A-1 Notes, notably with respect to payment priority if the trust's assets are insufficient to pay interest and/or principal. (See id. ¶ 12; Pl. 56.1 St., Docket Entry No. 7, ¶ 7; Intervenors' 56.1(b) St., Docket Entry No. 35, ¶ 27.) The Intervenors purchased their respective Notes either from the Initial Purchasers or on the secondary market; they did not purchase their Notes from the Issuer or Co-Issuer. (See Intervenors' 56.1(a) St., Docket Entry No. 55, ¶¶ 1-8.)

The Indenture provides that an "Event of Default" occurs if the periodic interest amount due on the senior notes is not paid. (Indenture § 5.1(a)(iii)(A).) An Event of Default arising from the failure to pay interest on the Class A-1 Notes occurred in April 2013 and Lansuppe exercised its right to accelerate the payment of the aggregate principal amount of those Notes following the default. (Compl. ¶ 2.) The Indenture permits two-thirds of the senior noteholders (the "Requisite Noteholders") to trigger liquidation following such an Event of Default. (See Indenture §§ 1.1, 5.2(a), 5.4(a)(iv).) In such a liquidation, the Indenture provides, Soloso's assets would first be distributed to senior noteholder classes, and junior noteholder classes would be paid only after the obligations to the senior classes are satisfied (the "Waterfall Provision"). (See Indenture § 11.1.) On July 31, 2015, Lansuppe, as the Requisite Noteholders, directed the Trustee to liquidate the Trust Estate pursuant to Section 5.4 of the Indenture. (Pl. 56.1 St., Docket Entry No. 7, ¶ 6.) It is undisputed that the trust's assets are insufficient to provide payment to the Intervenors if they are distributed in accordance with the Waterfall Provision. (See Intervenors' 56.1(b) St., Docket Entry No. 35, ¶ 27.)

The ICA requires an "investment company" to register with the Securities and Exchange Commission (the "SEC") unless the entity qualifies for an exemption. See 15 U.S.C. § 80a-3. Soloso is not registered with the SEC under the ICA, as it relied on an exemption for issuers whose securities are owned only by investors who are "qualified purchasers" within the meaning of the ICA. 15 U.S.C. § 80a-3(c)(7A); (see also Affidavit of Andrew Dean in Opposition to the Proposed Intervenors' Motion to Stay, Oct. 13, 2015, Docket Entry No. 71, ¶ 9). Some of the Intervenors are "Non-Qualified Purchasers" ("NQPs") under the ICA, and represent that they were not "qualified purchasers" at the time they purchased Soloso notes. In support of those representations, the Intervenors have proffered affidavits reciting statutory language (see Docket Entry Nos. 38-53); the evidentiary sufficiency of the affidavits is disputed by Lansuppe and Soloso.

## DISCUSSION

Legal Standard

A motion for summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). By contrast, if "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," and summary judgment is appropriate. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The burden of demonstrating that no genuine dispute of material fact remains

rests initially on the moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant makes the requisite showing, the nonmoving party must present specific facts demonstrating that there is a genuine issue for trial, which cannot be done merely through "[c]onclusory allegations, conjecture, and speculation."  Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (citations and internal quotation marks omitted).  In determining whether a genuine dispute of material fact exists, the Court draws all inferences in favor of the nonmoving party.  Scott v. Harris, 550 U.S. 372, 380 (2007).  Where there are cross-motions for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citation omitted).

"Under New York law, the initial interpretation of a contract is a matter of law for the court to decide."  Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002) (citing K. Bell & Assocs., Inc. v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d Cir. 1996)) (internal quotation marks and citation omitted).  "Interpretation of indenture provisions is a matter of basic contract law."  Sharon Steel Corp. v. Chase Manhattan Bank, N.A., 691 F.2d 1039, 1049 (2d Cir. 1982).  "In interpreting a contract under New York law, words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions."  Orange County Choppers, Inc. v. Olaes Enters., 497 F. Supp. 2d 541, 551 (S.D.N.Y. 2007) (citing LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005)) (ellipses, internal quotation marks, and citations omitted).  "Language that has a generally prevailing meaning should be interpreted in accordance with that meaning."  Id. at 552 (citing Restatement 2d Contracts § 202).

Lansuppe's Motion for Summary Judgment - Liquidation of the Trust

There is no dispute that Lansuppe constitutes the Requisite Noteholders under the Indenture, that Lansuppe gave the Trustee the required notice and instruction regarding the liquidation of the Trust's assets following the Event of Default in April 2013 in accordance with the Indenture and that, if the Trustee distributed the liquidated assets in accordance with the Indenture, the Waterfall Provision would apply and the Intervenors and other junior noteholders would not receive any distribution of assets.

The Intervenors argue, however, that the Court should preclude distribution in accordance with the Indenture because certain Intervenors are NQPs and Soloso is therefore in violation of the registration requirements of the ICA. The Intervenors assert that they are entitled to a declaration that the Indenture and its Waterfall Provision are void under Section 47(b) of the ICA because Soloso is in violation of Sections 7 and 8 of the ICA, which generally require the registration of investment companies and prohibit sales of interests to NQPs.[3] Section 47(b) of the ICA reads as follows:

> (1) A contract that is made, or whose performance involves, a violation of this title [15 U.S.C. §§ 80a-1 et seq.], or of any rule, regulation, or order thereunder, is unenforceable by either party (or by a nonparty to the contract who acquired a right under the contract with knowledge of the facts by reason of which the making or performance violated or would violate any provision of this title . . . or of any rule, regulation, or order thereunder) unless a court finds that under the circumstances enforcement would produce a more equitable result than nonenforcement and would not be inconsistent with the purposes of this title . . .

---

[3] The Intervenors have abandoned certain of their other arguments, including a contract-based argument that liquidation requires the consent of 100% of the noteholders.

> (2) To the extent that a contract described in paragraph (1) has been performed, a court may not deny rescission at the instance of any party unless such court finds that under the circumstances the denial of rescission would produce a more equitable result than its grant and would not be inconsistent with the purposes of this title . . ..

15 U.S.C.S. § 80a-46(b) (LexisNexis 2010). Assuming solely for the purposes of this analysis that the Intervenors' contention that NQPs are among their ranks is true, the Court turns to the threshold question of whether Congress has empowered the Intervenors, as private parties, to sue under Section 47(b).

The law is unsettled among lower courts as to whether Section 47(b) authorizes a private right of action for the invalidation of a contract that is allegedly violative of the ICA. In Alexander v. Sandoval, a case involving the question of "whether there is a private cause of action to enforce" Title VI of the Civil Rights Act of 1964, 532 U.S. 275, 278-79 (2001), the Supreme Court strictly limited the ability of federal courts to imply a private right of action from a federal statute and held that "private rights of action to enforce federal law must be created by Congress," stating that "[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy," id. at 286 (internal citations omitted). "Statutory intent . . . is determinative," and, "[w]ithout it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." Id. at 286-87.

Since Sandoval, the Second Circuit has applied four factors in analyzing whether a private right of action exists under certain sections of the federal securities laws, including the ICA. First, the court determines whether the clause contains an explicit private right of action on its face. See Bellikoff v. Eaton Vance Corp., 481 F.3d 110, 116 (2d Cir. 2007). Second, the court examines whether the act expressly provides one method to enforce a substantive rule,

such as providing the Securities and Exchange Commission (the "SEC") with the ability to conduct investigations and bring civil suits for injunctions and penalties "for enforcement of all ICA provisions," a statutory feature suggesting that Congress intended to preclude other methods.  See id.  Third, the Court considers whether a statute "'explicit[ly]'" provides "'a private right of action to enforce one section of [the] statute,'" a feature that "'suggests that omission of any explicit private right to enforce other sections was intentional.'" Id. (quoting Olmsted v. Pruco Life Ins. Co., 283 F.3d 429, 433 (2d Cir. 2002)).  Finally, the Court determines whether there is an "absence of 'rights-creating language,'" which "indicates a lack of congressional intent to create private rights of action."  Id. (quoting Olmsted, 284 F.3d at 435).  "More specifically, 'statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons.'" Id. (quoting Sandoval, 532 U.S. at 289) (internal brackets omitted).

Since Sandoval, most lower courts that have examined whether Section 47(b) creates a private right of action have found that no such right exists.  See Smith v. Oppenheimer Funds Distributor, Inc., 824 F. Supp. 2d 511, 517-21 (S.D.N.Y. 2011).  The Intervenors here rely on a number of cases decided before Sandoval and the Second Circuit's rulings in Olmsted and Bellikoff.  (See Reply Memorandum of Law in Support of the Intervenors' Cross-Motion for Summary Judgment, Docket Entry No. 118, at p. 13 (citing Blatt v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 916 F.Supp. 1343, 1349-50 (D.N.J. 1996); Krome v. Merrill Lynch Co., 637 F. Supp. 910, 918 (S.D.N.Y. 1986), opinion vacated in part on other grounds, 110 F.R.D. 693; Carr v. Equistar Offshore, Ltd., 1995 WL 562178, *14 (S.D.N.Y. 1995); Avnet, Inc. v. Scope Industries, 499 F.Supp. 1121, 1127 (S.D.N.Y. 1980); Cogan v. Johnston, 162 F. Supp 907, 909 (S.D.N.Y. 1958)).)  Those cases are unpersuasive in light of Sandoval and its Second Circuit

progeny.

Analysis of the Intervenors' claim under the Second Circuit's Bellikoff factors points clearly to the conclusion that the Intervenors have no private right of action under Section 47(b) of the ICA.  First, Section 47(b) does not explicitly provide for any such private right of action on its face.  See 15 U.S.C. § 80a-46(b).  Second, as the Second Circuit recognized in Bellikoff, the ICA expressly provides a comprehensive method to enforce the statute:  "[Section] 42 of the ICA explicitly provides for enforcement of all ICA provisions by the SEC through investigations and civil suits for injunctions and penalties."  481 F.3d at 116 (emphasis in original) (citing 15 U.S.C. §80a-41).  By authorizing the SEC to conduct investigations and bring civil suits for injunctions and penalties "for enforcement of all ICA provisions," including Sections 7, 8, and 47(b), Congress indicated that it intended to preclude other enforcement methods, such as creating an independent private right of action under Section 47(b).  See id. Third, as the Second Circuit found in Bellikoff, "[Section] 35(b) of the ICA creates a private right of action for investors in regulated investment companies for the breach of fiduciary duties," and "[t]hus, it seems apparent that Congress's omission of an explicit private right of action in [the ICA sections at issue in Bellikoff] as intentional."  Id.  The explicit creation of a private right of action in Section 35(b) of the ICA similarly suggests that Congress's omission of an explicit private right of action from Section 47(b) was intentional.  Finally, this Court concludes that there is "no implication of an intent to confer rights" on the Intervenors as a protected "particular class of persons."  This conclusion follows from the ICA's absence of rights-creating language and its focus on regulated entities, "'rather than the individuals protected'" by the statute.  See id. (quoting Sandoval, 532 U.S. at 289).

Even if Section 47(b) did provide Intervenors with an independent private right of

action, however, denial of their requested relief would be appropriate under the provisions of Section 47(b) that require the consideration of equitable principles in determining whether to deny enforcement or grant a request for rescission of a contract.  Both enforcing the Indenture by ordering the distribution of the liquidation proceeds under the Indenture's Waterfall Provision and denying Intervenors' request for rescission of their purchase through pro rata distribution of the Issuer's assets would produce more equitable results than the Intervenors' requested relief; neither result would be inconsistent with the purposes of the ICA.

First, it is particularly significant to an equitable analysis that neither the Issuer nor the Class A-1 noteholders, nor any other party to this action, sold the relevant Notes to the junior noteholder Intervenors.  Ordering the pro rata distribution of the Soloso trust liquidation proceeds, as the Intervenors request, would thus be a misplaced remedy.  Pro rata distribution of the trust's assets would not affect nor penalize the sellers who allegedly triggered the ICA violation by selling the Notes to NQPs.  Nor would it penalize the NQPs whose purchases allegedly triggered the alleged violation of the ICA; if anything, the NQPs would receive a larger distribution of proceeds than they would have been entitled to claim under a distribution pursuant to the Waterfall Provision.  Indeed, a pro rata distribution would principally harm the senior noteholders, including Lansuppe, which purchased notes providing for a lower rate of return during the life of the trust but a more secure right to payment in the event that the trust is not, as here, able to fulfill all of its obligations. Ordering the distribution of the liquidation proceeds pursuant to the Waterfall Provision of the Indenture, by contrast, honors the senior noteholders' legitimate investment choices and the junior noteholders' legitimate contractual expectations, and thus produces a more equitable result.

Second, ordering the distribution of the liquidation proceeds pursuant to the

Waterfall Provision would be consistent with the purposes of the ICA.  "[T]he ICA was enacted for the benefit of <u>investors</u>," and "in enacting the ICA, 'Congress intended to provide a comprehensive regulatory scheme to correct and prevent certain abusive practices in the management of investment companies for the protection of persons who put up money to be invested by such companies on their behalf.'"  <u>Reeves v. Continental Equities Corp.</u>, 912 F.2d 37, 41-42 (2d Cir. 1990) (quoting <u>Herpich v. Wallace</u>, 430 F.2d 792, 816 (5th Cir. 1970)) (emphasis in original).  There is no allegation here of internal fund mismanagement or abusive practices committed by Soloso or any other party to this litigation.  Enforcing the Indenture and the distribution of liquidation proceeds in accordance with the priority of payments waterfall protects the contractual rights of Soloso's investors, which is consistent with the purpose of the statute.  The Court thus concludes that the equitable relief provisions set forth in Section 47(b) of the ICA do not bar the liquidation of the Trust Estate and distribution of the corpus in accordance with the procedures and priorities established under the Indenture, and that denial of rescission is the more equitable result.

Because there is no private right of action under Section 47(b), the terms and effect of the Indenture are undisputed, and equitable considerations in any event warrant the enforcement of the stated terms of the parties' investment contracts, Lansuppe is entitled as a matter of law to its requested relief.  The Intervenors' contrary arguments, and thus their cross-motion, are meritless.  In light of the foregoing determinations, it is unnecessary to address the parties' statute of limitations and other additional arguments.

## CONCLUSION

For these reasons and those set forth in <u>Lansuppe Feeder, LLC v. Wells Fargo</u>

<u>Bank, NA ex rel. Soloso CDO 2005-1 Ltd.</u>, 2015 WL 6455274 (S.D.N.Y. Oct. 26, 2015), Lansuppe's motion for summary judgment is granted in full and Intervenors' cross-motion for summary judgment is denied.  The Trustee is hereby authorized and directed to distribute the proceeds of the liquidation in accordance with the priority of payments waterfall provisions of the Indenture.

The Intervenors are hereby directed to show cause by written submission, filed within fourteen (14) days of the date of this order, as to why their cross-claims for declaratory and injunctive relief and rescission of their purchases should not be dismissed in light of the determinations set forth in this Memorandum Opinion and Order.

This Memorandum Opinion and Order resolves Docket Entry Numbers 3, 36, and 87.

SO ORDERED.

Dated: New York, New York
        September 29, 2016

        /s/ Laura Taylor Swain
        LAURA TAYLOR SWAIN
        United States District Judge